**John Sweeney, Plaintiff-Appellee, v. Max A. R. Matthews, Defendant-Appellant.**

**Gen. No. 51,417.**

First District, Third Division.

March 14, 1968.

Rehearing denied and supplemental opinion May 2, 1968.

9

Howard, French and Healy, of Chicago (Richard G. French, of counsel), for appellant.

George W. Angerstein and Sidney Z. Karasik, of Chicago, for appellee.

10

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

This is a products liability case. The defendant, a merchant in the hardware and building supply business, appeals from a $45,000 judgment entered against him after a jury returned a verdict in favor of the plaintiff.

The principal points on appeal center around the applicability of the strict liability in tort doctrine to a seller of a simple object—a nail made for the penetration of concrete and mortar. There are lesser points relating to alleged trial errors which will be discussed later in the opinion.

The plaintiff was a carpenter employed by Hartman-Sanders Company—a millwork firm engaged in remodeling a restaurant. In the course of his work it became necessary to attach wood furring strips to a wall composed of brick and mortar. For this purpose he used special nails supplied by his foreman who had purchased them that same day at the defendant's store. The foreman had asked a salesman for "cut" nails but the defendant was out of them and the foreman was told that they had something as good if not better than cut nails: a concrete nail. A cut nail is square in shape and tapered towards the bottom. A concrete nail is round like an ordinary nail; however, it is harder, heavier and more resistive to bending pressure than an ordinary nail. The foreman ordered five pounds of the concrete nails and they were scooped out of an open bin and put into a brown paper bag.

As the plaintiff struck the nails with his hammer, the heads of the first three or four broke off and shot across the room. As he attempted to drive the next nail into the mortar it shattered and a piece struck him in the left eye and blinded him. Prior to the occurrence he had perfect vision in both eyes. At the time of the trial he could see light and bright colors but was unable to discern shapes with his left eye.

11

At the outset there is presented the defendant's objection to a pleading-procedural aspect of the case. The complaint sought recovery on three theories: negligence, express warranty and implied warranty. At the close of the plaintiff's case and at the termination of the trial the defendant moved for a directed verdict on the ground that none of the theories had been sustained by the evidence. The two motions were denied. The defendant renewed the contention in his post-trial motion and it was again denied. The plaintiff was then permitted to supplement his complaint by the addition of a strict liability in tort allegation. The defendant contends that since each of his motions should have been granted the supplemental allegation came too late.

 First of all, the plaintiff had introduced evidence which tended to prove each of his theories and the evidence was sufficient to justify their submission to the jury. Therefore, the trial court ruled correctly in denying the defendant's motions. Second, the allegations of the complaint were adequate, in and of themselves, to sustain a recovery under the strict liability theory and an instruction on this theory had been given to the jury. A failure to specifically allege strict liability does not necessarily make a complaint deficient. Haley v. Merit Chevrolet, Inc., 67 Ill App2d 19, 214 NE2d 347 (1966). In Haley the court had before it a complaint which charged negligence, express warranty and implied warranty. The court said:

> "It is true that none of the counts base a claim for recovery on the Suvada [Suvada v. White Motor Co., 32 Ill2d 612, 210 NE2d 182 (1965)] theory of strict liability in tort. But the complaint in Suvada itself fails to do so, and yet the Supreme Court affirmed the Appellate Court's holding that the complaint stated a cause of action. There, as here, the complaint based its claim for relief upon theories of

12

negligence and of implied warranty. The failure to state clearly the Suvada theory therefore does not make the complaint insufficient."

Third, the Civil Practice Act provides that pleadings may be amended at any time, before or after judgment, to conform to the proof. Ill Rev Stats 1965, c 110, § 46(3). The complaint was filed before the Suvada decision which approved strict liability in tort. The supplement was filed after that decision became final. The complaint was thus revised by definitively adding an up-to-date theory of recovery to those already pleaded, which theory conformed to the proof already adduced. The trial court did not err in permitting the amendment.

■ The Suvada decision emphasized that in order to recover under the strict liability theory a plaintiff, who claims that he was injured by reason of a defective product, must prove that his injury resulted from a condition of the product, that the condition was an unreasonably dangerous one and that the condition existed at the time it left the manufacturer's control. The defendant contends that the plaintiff did not meet the standards of proof required by Suvada and that strict liability does not apply to a retailer.

■ The latter contention cannot be upheld. In Suvada strict liability was applied to a manufacturer but the court noted that liability extends to a seller of a defective product. In Haley v. Merit Chevrolet, Inc., previously cited, and in McKee v. Brunswick Corp., 354 F2d 577 (7th Cir 1965), a case interpreting Illinois law, strict liability was applied to retailers. The rationale behind this application is aptly set forth in Vandermark v. Ford Motor Co., 61 Cal2d 256, 37 Cal Rptr 896, 391 P2d 168 (1964):

> "Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and

13

marketing enterprise that should bear the cost of injuries resulting from defective products. [Citation.] In some cases the retailer may be the only member of that enterprise reasonably available to the injured plaintiff. . . ."

■ Before a consumer can recover from a retailer he must prove that: the retailer sold the product, the product was defective, the defect made the product unreasonably dangerous, the defect was in the product when it was sold by the retailer, the consumer used the product for the purpose it was intended and in the way it was intended to be used or for a purpose and in a way that was reasonably foreseeable, and the defective product caused his injury. In the present case there is no dispute as to three of these elements. The plaintiff was injured by the nail, the nail was sold by the defendant and, if there was a defect, it was in the nail at the time it was sold. Moreover, the plaintiff was using the nail for a proper purpose and there was adequate proof that he was using it in a proper manner. The nail was designed to facilitate the affixing of other objects to concrete or mortar and this is precisely the use the plaintiff made of it. He testified that he was hitting the nails squarely and demonstrated his method of hammering them to the jury. However, other witnesses testified that concrete nails are brittle, have a tendency to break rather than bend and that such nails must be struck exactly on the head and hammered in straight to keep them from breaking and "go[ing] like bullets" in different directions. This testimony implied that perhaps he was not striking the nails correctly. At most, the implication presented a question of fact for the jury's determination.

To prove that the nail was defective, the plaintiff called as an expert witness a metallurgical engineer. The witness testified that he made a random selection of one dozen nails from the brown paper bag and subjected them,

and some nail fragments which were in the bag, to a battery of tests. All of the tests were not performed on the fragments for fear of destroying them.

The tests indicated that there were two types of nails and these were separated into groups A and B for identification purposes. Group A consisted of three nails and group B of nine. The nails in group A were ductile and bent to 180 degrees. The nails in group B were brittle and fractured when subjected to a bend test. When a microhardness test was performed the nails in group A displayed a uniform hardness throughout each nail (a Rockwell test hardness of 41C), while those in group B were much harder on the surface than at the core (a Rockwell test of 63C on the surface, 21C at the core).

A chemical analysis was performed and seven common elements compared. All of the elements were found to exist in relatively the same proportion in the two groups with the exception of carbon which was twice as high in those nails belonging to group A than in the nails belonging to group B. It was the opinion of the witness that this difference accounted for the brittleness of the nails in group B and that the variance between the carbon composition of the two groups occurred during the manufacture of the nails when those in group B were given an improper heat treatment and surface carbon was lost due to overheating. He further testified that microscopic tests indicated that the fragments (which had been found on the floor of the room in which the plaintiff was working) were the same as the nails in group B. He believed the nails in both groups were made from the same piece of steel and that the group A nails were of sufficient hardness to penetrate concrete.

■■■■■■ In view of the unrebutted testimony of the metallurgist, a justifiable inference could be drawn that, even though concrete nails are by their very nature more dangerous to use than ordinary nails, it was the low carbon content in the nails used by the plaintiff which

15

caused them to shatter as they did, and that the nails therefore were defective and unreasonably dangerous. A nail in itself is not a dangerous product; but a nail defectively made, which has the propensity because of a hidden defect to splinter and fly in all directions, is an unreasonably dangerous product.

 The plaintiff met his burden of proof. As we mentioned, some elements of proof were not in controversy. As to the others there was sufficient evidence from which the jury could conclude that the plaintiff struck the nails correctly, that most of the nails were defectively manufactured, that the defect made them unreasonably dangerous and that one of the defective nails injured the plaintiff.

This brings us to another important issue: the conduct of the plaintiff—and the instructions of the court in reference to this conduct. The plaintiff had used concrete nails prior to the accident and knew that they were hardened nails which would not bend like ordinary ones. The day before he was injured he had been sent to purchase hardened square-cut nails; he found them unsatisfactory because they would bend and not penetrate mortar, so he returned them. However, he continued to use the concrete nails despite the fact that they too were unsatisfactory. He testified that as he was striking the nails the thought entered his mind that either he was doing something wrong or that something was wrong with the nails themselves. Nevertheless, this did not deter him. Nor did he stop to put on safety glasses—although Hartman-Sanders had instructed its carpenters to use them when hammering concrete nails. While the glasses were not at hand, they were available at the employer's nearby place of business. Another carpenter was nailing furring strips in the same room with the plaintiff. He started using the nails before the plaintiff did and testified that every second nail he struck broke and flew over the room.

The plaintiff's apparent indifference to consequences might have justified a directed verdict against him were it not for other factors which made his conduct a jury question. He was nineteen years of age and had worked as a carpenter for only a short time. Although he held a journeyman's card he had never worked as an apprentice and had no experience as a carpenter before being employed by Hartman-Sanders. He had used concrete nails before the accident but none had broken and he thought they could take more abuse than other nails. He and the other carpenter were working on opposite walls; his own assignments took him out of the room much of the time and he was unaware that the other man was experiencing trouble with the nails. He said that as far as he knew safety glasses were not required. He never saw the carpenters with whom he worked use them and the older, more experienced carpenter working in the room with him was not using them the afternoon of the accident.

All this evidence made the reasonableness of the plaintiff's conduct a borderline question which the jury might have decided either way. Because of this, it is necessary to scrutinize the instructions bearing on his conduct.

■■■ The defendant had been permitted to amend his answer to raise the affirmative defense of assumption of risk and he tendered an instruction on this defense. The plaintiff objected. No objection was made to the content of the instruction. The objections were three in number: first, that the doctrine of assumption of risk was inapplicable because it is only available in master-servant relationships; second, that the assumption of risk defense, having been filed at the close of all the evidence, came too late for the plaintiff to contest and, third, that the defense of contributory negligence was available to the defendant. The court refused the instruction and the defendant asserts that this was error.

Since the court offered the plaintiff the opportunity of reopening his case to meet the affirmative defense, his second objection was not well taken. His first and third objections, however, merit examination.

The objection that the defense of assumption of risk can only be used when the plaintiff is the employee of the defendant was a substantially accurate statement of Illinois law. The defense has not been recognized in Illinois except in employer-employee cases, in cases in which a contractual relation existed between the plaintiff and defendant, and in two other cases, one involving a patron of an amusement park and one a player on a golf course. There are, in fact, only two instructions on assumption of risk in our Illinois Pattern Jury Instructions: one (13.02) relates to the employer-employee relationship and the other (13.01) to the contractual relationship.

Ninety-four years ago the Illinois Supreme Court followed the settled law and held that an employee, injured because of defective machinery, who had knowledge of the defects and continued to use the machinery, could not recover against his employer because he assumed the risk of such defects. Camp Point Mfg. Co. v. Ballou, 71 Ill 417 (1874). This was also the holding in Pennsylvania Co. v. Lynch, 90 Ill 333 (1878). These decisions did nothing more than permit the assumed risk defense in master-servant cases; thereafter, however, Illinois courts limited the defense to such cases. In Pennsylvania Co. v. Backes, 133 Ill 255, 24 NE 563 (1890) the court held that an instruction on assumed risk was not applicable to the facts because the relation of master and servant did not exist. In B. Shoninger Co. v. Mann, 219 Ill 242, 76 NE 354 (1906) the court stated: ". . . the doctrine of assumed risk rests upon and grows out of the contractual relation which exists between master and servant." And in Conrad v. Springfield Ry. Co., 240 Ill 12, 88 NE 180 (1909) it was said: ". . . the doctrine of the assumption of risk is only applicable to cases arising

18

between master and servant." These pronouncements fixed the law in Illinois and they have been echoed down to the present day.

There are some cases which express the applicability of the doctrine in terms of a contractual relationship. In Chicago & E. I. R. Co. v. Randolph, 199 Ill 126, 65 NE 142 (1902) it was held that an instruction on assumed risk was properly refused because there was no contractual relation between the parties. See also: Mueller v. Phelps, 252 Ill 630, 97 NE 228 (1912); Walsh v. Moore, 244 Ill App 458 (1927) and Reed v. Zellers, 273 Ill App 18 (1933).

The defense has been allowed in a very few noncontractual and nonmaster-servant cases. An isolated case was Brownback v. Thomas, 101 Ill App 81 (1902) where the court, without reference to the prior Supreme Court decisions, broadly stated that one who voluntarily does an act which results in his injury assumes the risk and cannot recover damages. In Murphy v. White City Amusement Co., 242 Ill App 56 (1926) it was held that a patron injured on an amusement device assumed the risk of injury. In Campion v. Chicago Landscape Co., 295 Ill App 225, 14 NE2d 879 (1938) a golfer was struck by a ball while playing on a public course. The court surveyed cases from other jurisdictions and concurred with those which held that there may be a voluntary assumption of a known danger independent of a contractual or master and servant relationship. In both the Murphy and Campion cases, however, it can be argued that there was a contractual relationship between the plaintiff and the defendant. Although leave to appeal was denied (296 Ill App XVII) the Campion pronouncement exerted little influence upon subsequent decisions. It was found to be unpersuasive, in the face of the contrary Supreme Court decisions, in Hensley v. Hensley, 62 Ill App2d 252, 210 NE2d 568 (1965), and deserving of little weight, as obiter

19

dictum, in Maytnier v. Rush, 80 Ill App2d 336, 225 NE2d 83 (1967).

The criticism of the Illinois limitation has not been confined to the Campion case. Legal writers speak of it disparagingly. For example, in his Law of Torts, 3rd ed, section 67 at page 450 (1964), Dean William L. Prosser cites Conrad v. Springfield Ry. Co. as a case in point in stating: "There are even courts which have limited the use of the term 'assumption of risk' to cases in which the parties stand in the relation of master and servant, or at least some other contractual relation. . . ." And at page 459 he cites B. Shoninger Co. v. Mann as an example of an early decision which is still adhered to, in stating that:

> "Although it was said in early decisions, and is still repeated by some courts, that assumption of risk will not be found apart from a contract relation between the parties, it is now generally recognized that the basis of the defense is not contract but consent."

 Pennsylvania Co. v. Backes, B. Shoninger Co. v. Mann and Conrad v. Springfield Ry. Co., and the cases which followed them, were decided under negligence law. We are now confronted with a tort action not based on negligence. A manufacturer can be most careful in making and testing his product, a purveyor can be free of all negligence in selling it, but both can be held accountable if a defect, unknown to them, was in the product at the time it was made or sold. Under this action negligence of the user in failing to discover the defect is not a defense; his negligence in failing to appreciate the danger of the defect is not a defense. Unless the liability of the manufacturer and the purveyor is to be regarded as absolute, appropriate defenses must be available to them. The present restricted application of the defense of assumption of risk should be reviewed; but irrespective of whether the defense is permitted in all

negligence actions, it cannot logically be prohibited in strict liability actions.

 The ultimate user has no duty to inspect a product to see if it is free of defects. Unless a defect is obvious, he has the right to assume that the product is safe and that it will not injure him if it is used normally. This being true, he is not negligent if he fails to discover the defect. If, however, he finds out that a product is defective and, because of this, dangerous, and uses it anyway—he is more than negligent; he is deliberately taking a chance that he will escape injury. Failure to discover the defect is not contributory negligence; deliberately proceeding to use the product after discovery is assumption of risk.

This is the general rule in other jurisdictions. The case law is summarized in the following quotations. Dean John W. Wade in, Strict Tort Liability, 19 Sw LJ 5, pp 21–22 (1965) states:

> "The cases appear to be in disagreement as to whether contributory negligence of the plaintiff bars his recovery in an action for strict products liability. In general, however, they can be reconciled by adverting to the customary distinction between contributory negligence and assumption of risk. If the plaintiff's negligence was in failing to discover the unsafe condition of the product he can usually recover; if his negligence was in continuing to use the product after learning of the danger condition, his recovery is usually barred."

Dean Prosser puts it this way:

> "It frequently is said that the contributory negligence of the plaintiff is not a defense in cases of strict liability. . . . At the same time, the defense which consists of voluntarily and unreasonably en-

21

countering a known danger, and in negligence cases passes more or less indiscriminately under the names of contributory negligence and assumption of risk, will, in general relieve the defendant of strict liability. Here, as elsewhere, the plaintiff will not be heard to complain of a risk which he has encountered voluntarily, or brought upon himself with full knowledge and appreciation of the danger. . . . Upon this basis, the kind of contributory negligence which consists of voluntary exposure to a known danger, and so amounts to assumption of risk, is ordinarily a defense." Law of Torts, 3rd ed, § 78, pp 538, 539 (1964).

The same rule is set forth in comment n of section 402A of the American Law Institute's Restatement of the Law (Restatement, Second, Torts):

". . . Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery."

This rule may appear, at first sight, to be contrary to the pronouncement in People ex rel. General Motors Corp. v. Bua, 37 Ill2d 180, 226 NE2d 6 (1967) where the court said:

"This is a products liability case pleaded in two counts, one alleging negligence, and the other alleg-

ing breach of warranty. in Suvada v. White, 32 Ill 2d 612, this court adopted the theory which imposes strict tort liability on the manufacturer. Under that theory, negligence need not be proved and a plaintiff has only to prove that his injury or damages resulted from a condition of the product, that the condition was an unusually dangerous one, and that the condition existed at the time the product left the manufacturer's control. However, under both counts it is necessary to prove that the plaintiff was in the exercise of due care for his own safety."

The last sentence has been interpreted as requiring proof of freedom from contributory negligence in strict tort liability cases. In Dunham v. Vaughn & Bushnell Mfg. Co., 86 Ill App2d 315, 229 NE2d 684 (1967), a strict tort liability case, the court equated contributory negligence with assumption of risk after saying: "We interpret the language of Bua to state that freedom from contributory negligence is an element to be proven, both in products liability and warranty cases." In Ozman, Products Liability Under the Suvada Theory, 55 Illinois Bar Journal 960 (1967), the author says that Bua "unequivocally" means that a cause of action founded upon a theory of strict liability requires proof that the plaintiff was in the exercise of due care for his own safety. We are not certain if these interpretations are correct. The reference in Bua to the requirement of due care could be to the two counts pleaded in that case: negligence and warranty. In any event, the position we have taken in this opinion is not in conflict with Bua. We have indicated that misuse of a product may defeat a plaintiff's claim but have held that negligence in failing to discover a defect will not. Even if the court in Bua was referring to strict liability, it did not state whether the plaintiff was required to prove due care in the way he used the product or due care in ascertaining if the product was defective. It does not appear that the court could have meant the

23

■■■■■■■■■

latter. In Suvada it was said, in reference to indemnity, that negligence would be the antithesis of strict liability. Moreover, the court there said its views coincided with the position taken in section 402A of Restatement of the Law of Torts; presumably this would be approval of the interpretative comments accompanying that section—including the one which coincides with our view: comment n.

The third objection made by the plaintiff to the tendered instruction on assumption of risk was that it was unnecessary because instructions submitted under the negligence count made the defense of contributory negligence available to the defendant. Although contributory negligence and assumption of risk frequently overlap, differentiating them is of great importance to the injured party in a strict liability case. Professor Robert E. Keeton in his article, Assumption of Risk in Product Liability Cases, 22 Louisiana L Rev 122 (1961) defines six categories of assumed risk and states at page 133 that while all six will sometimes overlap with contributory negligence neither doctrine can be said to be only a phase of the other and that the intermingling of the two serves only to cause confusion. At page 164 he observes:

> "Confusion is less likely, both on the bench and in the jury room, if consent to risk is treated instead as a distinct, affirmative defense, concerned with the plaintiff's own participation in bringing about the harm of which he is complaining."

■■■■■■■ The distinction between the two defenses was noted in Minters v. Mid-City Management Corp., 331 Ill App 64, 72 NE2d 729 (1947) and in Chicago & E. I. R. Co. v. Heerey, 203 Ill 492, 68 NE 74 (1903) where the court said: "Contributory negligence and assumption of risk are entirely different things in the law. Although the two questions may both arise under the facts of a case, yet they are wholly separate and distinct." Contributory

24

negligence involves inadvertence, carelessness, unintentional failure to exercise ordinary care for one's own safety; it is measured by the objective standard of a reasonably careful person; freedom from contributory negligence must be pleaded and proved by the plaintiff. Assumption of risk involves conscious exposure to danger, consent to or the deliberate decision to encounter a known risk, the willingness to take a chance; it is more subjective than objective; assumption of risk is an affirmative defense which must be pleaded and proved by the defendant. Bohlen, Voluntary Assumption of Risk, 20 Harv L Rev 14, 91 (1906); Bohlen, Contributory Negligence, 21 Harv L Rev 233 (1908).

 At the time the objection was made to the instruction on assumption of risk, the court had accepted instructions on negligence, submitted by both the plaintiff and defendant, and subsequently gave them to the jury. These instructions defined negligence and contributory negligence and informed the jury that the plaintiff claimed he was injured while exercising ordinary care for his own safety; that he had the burden of proving this; that it was his duty to use ordinary care and this meant that he had to be free of contributory negligence. While the instructions were not the equivalent of one on assumed risk, they did impose a standard of care which would have defeated the plaintiff's claim if the jury found that he voluntarily exposed himself to a recognized risk. Under the instructions the jury could have found that he was negligent in failing to discover that the nails were defective or in failing to realize the danger that the shooting fragments could enter his unprotected eyes. This was something the jury would not have been permitted to do under an appropriately worded instruction on assumption of risk. Under the given instructions it was the burden of the plaintiff to prove that he was exercising the care for his own safety that a reasonably prudent person would have used under the same circum-

stances. It was his burden to prove that he was free of negligence in hammering a fifth nail after four had shattered; that he was free of negligence in proceeding as he did even though he suspected something might be wrong with the nails. Under an instruction on assumed risk the plaintiff would not have had such burdens. Instead the burden would have been on the defendant to prove to the jury's satisfaction that the plaintiff knew the nails were defective, appreciated the danger and deliberately and unreasonably exposed himself to it nevertheless, or that the defect and danger were so open and obvious that the plaintiff must have comprehended and appreciated them. The defendant, therefore, benefited more from having the jury instructed on the defense of contributory negligence than if the jury had been instructed on the more difficult to prove defense of assumption of risk. Under this circumstance the defendant, while entitled to a proper instruction on assumed risk, was not prejudiced by the trial court's refusal to accept the tendered instruction.

The additional trial errors urged by the defendant pertain to the foundation laid for the admission into evidence of the nails and the nail fragments, the restrictions imposed on the cross-examination of a witness who was one of the persons having possession of the nails subsequent to the occurrence, and an instruction given in behalf of the plaintiff.

The instruction concerned the requirements of proof. The defendant did not object to this instruction at the conference on instructions and his objection cannot be voiced for the first time on review. Bucyna v. Rizzo Bros. Movers, Inc., 31 Ill App2d 31, 175 NE2d 640 (1961).

Between the accident and the trial the nails were at different times in the possession of the owner of the restaurant, the officer manager of the Hartman-Sanders Company, an insurance investigator, the metallurgist and an office associate of the plaintiff's attorney. The res-

26

taurant owner testified that immediately after the accident he went into the room which was being remodeled and picked up three pieces of nail he observed on the floor. He placed these in a brown paper bag which was also on the floor and delivered the bag to Hartman-Sanders. The office manager examined the bag and found that it contained whole nails and nail fragments. The bag was then turned over to the insurance investigator who examined the contents, separated the nails and the fragments and delivered them to the metallurgist. The latter returned them to the investigator and they remained in his possession until he gave them to the lawyer associated with the plaintiff's attorney. Each witness in the chain of possession identified the bag, the nails and the fragments, either positively or substantially, and testified that they appeared to be in the same condition as when he had them in his possession. Although there were minor variations in the testimony, a review of the record as a whole shows that an adequate foundation was laid for the admission of the exhibits.

The defendant complains that the court unfairly restricted the cross-examination of the investigator. The investigator's employer was an insurance company which insured the Hartman-Sanders firm and paid workmen's compensation to the plaintiff. The defendant wished to show the insurance company's interest in the outcome of the case by reason of its subrogation right against the plaintiff's claim. It is always permissible to show the motive, bias or prejudice of a witness or his interest in the result of the litigation and this may be done despite the fact that it may disclose insurance coverage. Seyferlich v. Maxwell, 28 Ill App2d 469, 171 NE 2d 806 (1961); Pinkerton v. Oak Park Nat. Bank, 16 Ill App2d 91, 147 NE2d 390 (1958); Moore v. Young, 317 Ill App 474, 46 NE2d 852 (1943). Latitude must be allowed in cross-examination in matters affecting credibility but the extent of which it is permitted rests largely

in the discretion of the trial court. After conferring with the attorneys the court ruled that it could be shown that the insurance company which employed the investigator had an interest in the case adverse to the defendant but that the jury could not be informed of the nature of the interest. In making this ruling the court was fair to both parties. Injection of the compensation received by the plaintiff was avoided but the defendant was permitted to impeach the credibility of the investigator by showing his employer had an interest in the outcome of the case. This is the exact inference which would have been created by referring specifically to the workmen's compensation and the subrogation claim, but without the prejudice these references could have caused the plaintiff's case.

The judgment of the Circuit Court is affirmed.

Affirmed.

SCHWARTZ and SULLIVAN, JJ., concur.

SUPPLEMENTAL OPINION ON PETITION FOR REHEARING

In his petition for rehearing the defendant argues that the trial court's refusal to give his instruction on assumption of risk was prejudicial error for two reasons: first, because the jury could have found the plaintiff guilty of contributory negligence under the negligence theory of the case but found the defendant liable under the strict liability theory; second, since this was a borderline case which the jury could have decided either way, it was imperative for the jury to have been properly instructed.

The first argument is unsound. If the jury found that the plaintiff was guilty of contributory negligence it could not, under the instructions of the court, have found the defendant liable under either theory.

28

The second argument presumes that the tendered instruction was an accurate statement of the law. We refrained from commenting on the instruction in our opinion because its accuracy was not in controversy; as we said: "No objection was made to the content of the instruction." We stated that the defendant was entitled to a proper instruction on assumption of risk; we also spoke of an appropriately worded instruction on the same subject. The qualifying words were employed because the submitted instruction was neither correctly adapted to the facts of the case nor correctly related to strict tort liability.

The instruction was offered as a modified version of IPI 13.02 but, even though modified, it retained features applicable to the employer-employee relationship. It spoke of the dangers ordinarily accompanying the activities undertaken by the plaintiff. The danger in this case arose because of a defect in the particular nails sold by the defendant—not because the plaintiff assumed the general risk of hammering nails as a carpenter working for Hartman-Sanders. The instruction permitted the defendant to be exonerated if he proved, together with two other propositions, that the plaintiff "in the exercise of ordinary care would have known the dangers existed and realized the possibility of injury from them." As our opinion pointed out, this defense is unavailable in a strict liability case. Furthermore, the instruction did not distinguish between the exercise of ordinary care (or the freedom from contributory negligence) arising from the possible misuse of the product, and that arising from failing to discover the defect in the product or from failing to guard against the possibility of its existence.

■ ■ Although an objection directed to these deficiencies might have brought forth a corrected instruction, this consideration is of no significance since the plaintiff's objection was to the giving of any instruction

■■■■■■■■■■

on the assumption of risk, not just to this particular instruction. It was the defendant's obligation to tender a proper instruction on the applicable law and since he did not he cannot complain that his instruction was refused. The fact that the court rejected the instruction for other reasons is inconsequential. The reason the court may give for its decision is immaterial if the decision is correct. Cady v. Hartford Fire Ins. Co., 56 Ill App2d 429, 206 NE2d 535 (1965).

The petition for rehearing is denied.