Edwin T. Noncek, et al., Plaintiffs-Appellees, v. Ram Tool Corporation, an Illinois Corporation, Defendant, Third-Party Plaintiff-Appellant, v. Cyclone Blow Pipe Company, a Corporation, a/k/a U. S. Blow Pipe and Dust Collecting Co., Third-Party Defendant-Appellee.

### Gen. No. 51,931.

First District.

August 21, 1970.

Rehearing denied November 6, 1970.

William P. Nolan, Pretzel, Stouffer, Nolan & Rooney, of Chicago (Joseph D. Lederleitner, of counsel), for appellant.

Kralovec, Sweeney, Marquard & Scoby, of Chicago (Henry J. Marquard and Edward V. Scoby, of counsel), for appellee.

STOUDER, J.

Plaintiff, Appellee, Edwin Noncek, commenced this action in the Circuit Court of Cook County seeking damages for personal injury against Ram Tool Corporation, Defendant, Appellant. Ram Tool Corporation filed a third-party action seeking indemnity from Cyclone Blow Pipe Company, third-party Defendant, Appellee, the latter company being the plaintiff's employer. The issues were heard by a jury, and at the close of all the evidence, a verdict was directed against Ram Tool and in favor of Cyclone Blow Pipe Company on the third-party action. The jury returned a verdict in the amount of $107,840 in favor of plaintiff Noncek and against defendant Ram Tool Corp. Post-trial motions were de-

nied and Ram Tool has appealed both from the adverse ruling on the motion for directed verdict and from the verdict against it.

On Saturday, August 1, 1964, the plaintiff a sheet metal worker, was sent by his employer, Cyclone Blow Pipe Company, to work at the Sunbeam plant in Chicago. He had worked there many times before, the last time being the preceding Saturday. The job to be done on the day in question was an installation on the exhaust hood at an open plating tank. The exhaust hood was part of a ventilating system designed to carry away the harmful fumes from the vat of copper cyanide. The plating tank was an open tank seventy to ninety feet long, four feet wide and four feet deep. A system of power rails, bars, and posts was attached to the plating tank, enabling racks containing objects to be plated to be lowered into the plating solution so that electroplating could take place. Because of the superstructure, necessary to raise and lower the racks, located above the tank, the hoods could not be located there but, instead, were located inside of the tank just above the surface of the liquid and the fumes were vented through the floor. The job of plaintiff was to install certain prefabricated hinged sections designed to improve the draw of the hoods, such sections being specially designed to avoid contact with the power rails and other structures.

On the day in question, plaintiff started work at the Sunbeam plant at about 7:30 a. m. After working at other jobs during the morning, plaintiff together with a coworker, Oscar Lund, went to the plating room and began work installing the sections referred to. The work consisted of making a dent or dimple with a punch to act as a guide for the drill, then drilling a hold with an electric drill and finally attaching the section with a self-threading metal screw. The day was humid, temperature in the 90's, and although the electroplating tank

323

was not in operation, the solution was warm and emitting fumes. Plaintiff had been using a quarter-inch electric drill belonging to a Don Kirksler. By four o'clock in the afternoon, he had completed approximately one hundred holes and decided to change drills because the one he was using was hot and the bit was slipping. According to his testimony, he took a one-half inch Ram electric drill from an unopened carton in his tool box, the tools having been supplied by his employer. In doing the work, plaintiff knelt on one knee on a bar running along the inside of the tank. According to plaintiff, after connecting the Ram drill with an extension cord and as he was about to use the Ram drill for the first time, he depressed the trigger, received a shock and both he and the drill fell into the plating tank. The plaintiff was helped out of the tank by Love, a Sunbeam employee who was standing near the tank. Love assisted plaintiff to a nearby emergency shower where the cyanide solution was washed off. Love also pulled the drill out of the plating tank and left it lying on the floor. After the shower, plaintiff was taken to the hospital. As a result of emersion in the copper cyanide solution, plaintiff sustained chemical burns to the right side of his face resulting in total loss of sight in his right eye.

In three counts plaintiff sought recovery on the theory of implied warranty, negligence and strict liability.

In seeking to reverse the judgment entered on the verdict, defendant first argues that it was prejudicial error to admit and refuse to strike speculative and conjectural opinion evidence as to the cause of the shock. Since one of the principal issues was the cause of the shock from the drill, a cause not easily ascertainable, each party presented and devoted a considerable part of the hearing to opinion evidence. Salzenstein, a laboratory testing engineer and Lewis, a university professor, testi-

fied for plaintiff. Flood, a laboratory testing engineer and Schiffer, an executive of Ram Tool, testified for defendant.

In arguing that the opinion evidence of plaintiff's experts was incompetent and, hence, should not have been admitted, plaintiff insists first that the drill which after examination formed the basis of the expert opinions, was not in the same condition as of the time of the incident and second, that the opinions were based on facts not in evidence.

Within five to eight minutes after plaintiff and the drill had fallen into the plating tank and after plaintiff had been helped therefrom, a Sunbeam electrician preparing to leave for the day, heard that a person had fallen into the plating tank and that an electric drill needed checking. He came to the area and found a drill lying on the floor near the tank. After checking the drill with an ohmmeter, he concluded that it was shorted. He then plugged the drill in, pressed the trigger and a "pftt" resulted. He then left the drill lying on the floor near the tank. The drill was then picked up by Lund, the co-worker, and including Lund, seven persons testified to their possession of the drill in a connected chain from that date until it was delivered to Salzenstein approximately thirty days later.

Salzenstein testified at length. He described his examination of the drill, taking the handle apart and observing the inside visually and in addition, various parts microscopically. He observed evidence of two shorts, one on the output side of the switch and the other on the input side of the switch. The wire from the output side was multistranded and he observed one strand of the wire which was not under the screw or within the insulated part of the wire and which he hypothesized short circuited through the handle, such condition being causally related to the shock sustained by plaintiff. He

also hypothesized that the other short circuit was caused when the Sunbeam maintenance worker pressed the trigger on the drill after it was removed from the plating tank.

Lewis, who examined the drill a few weeks before trial, testified to the same causal relationship between the condition of the drill and the electric shock.

Schiffer, the Ram Tool executive, described and demonstrated the electric drill circuitry and the testing methods employed by defendant.

Flood, defendant's expert, described experiments which he had conducted with other Ram drills, including emersing the same in the copper cyanide tank at Sunbeam under different conditions. He hypothesized that the short circuits in the drill observed by Salzenstein occurred after the drill had been dropped into the solution and, therefore, the shock could not have been the result of any defect in the drill.

Defendants insist that the drill was not in the same condition when examined by the experts as at the time of occurrence and, therefore, opinions based thereon are incompetent under the authority of Jines v. The Greyhound Corp., 33 Ill2d 83, 210 NE2d 562, LaSalle Nat. Bank v. Feldman, 78 Ill App2d 363, 223 NE2d 180 and Paul Harris Furniture Co. v. Morse, 10 Ill2d 28, 139 NE2d 275. The foregoing cases illustrate factual situations in which the lack of proper foundation or connection between facts involved warranted the conclusion that the evidence was improperly admitted. The facts in each case are substantially dissimilar to those in the instant case and hence, the results in each case are of little assistance by way of analogy.

Concededly, no one examined or tested the drill after it left defendant's factory and before it was used by plaintiff, the plaintiff having removed it from its original carton. This does not mean that the conditions existing at, and prior to the occurrence were not

susceptible of ascertainment. Taylor v. The Carborundum Co., 107 Ill App2d 12, 246 NE2d 898. There is no argument but that a shock may be the result of a short circuit in an electrical system and that subsequent examination of an electrical system may both reveal that a short circuit has occurred and the cause of the short circuit, i. e., the condition existing prior thereto.

In considering whether evidence or opinions based thereon is competent, we are primarily concerned with the probative value of such evidence or testimony. Relevance, in turn, depends upon a reasonable assurance of the physical integrity of the evidence and also a reasonable relationship between the conditions observed and the cause asserted as the basis of liability. See Gass v. Corducci, 37 Ill App 181, 185 NE2d 285.

In the case at bar, we believe the evidence is sufficient to indicate that the drill was not tampered with either inadvertently or otherwise prior to its examination by Salzenstein. Furthermore, Salzenstein's opinion not only is based on the conditions which he observed but also takes into account the events which took place after the drill was used by the plaintiff. Under such circumstances, we believe that the opinions of Salzenstein and Lewis were based on facts properly received in evidence and the court did not err in failing to exclude their testimony.

Based on the opinions of the experts on behalf of plaintiff, we believe there is ample evidence supporting the conclusion that a defect existed in the drill. Defendants' argument to the contrary requires disregard of the testimony of plaintiff's experts and complete acceptance of the contrary opinions of defendants' experts. The resolution of this issue was appropriately left to the jury.

Defendants next contend the trial court erred in rulings on instructions. At the request of plaintiff and over the objection of the defendants, the court gave the

327

following instruction, "The plaintiffs have the burden of proving each of the following propositions: That the injury or damage was proximately caused by a condition of the electric drill; That the condition of the electric drill was an unreasonably dangerous one; That the condition existed at the time the drill left the manufacturer's control. If you find from your consideration of all the evidence that each of these propositions has been proved, then your verdict should be for the plaintiffs, but, if, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved, then your verdict should be for the defendant." (Plaintiff's Instruction No. 17.)

At the request of defendant and over the objection of plaintiff, the court gave the following instruction, "The plaintiffs have the burden of proving each of the following propositions: First, that the defendant manufactured a drill which had a defect in it, prior to the drill's passing out of defendant's possession; Second, that the claimed defect existed at the output, or discharge, side of the switch; Third, that the defect made the drill unreasonably dangerous to the user; and Fourth, that the injuries of the plaintiff were directly and proximately caused by the said defective condition. If you find from your consideration of all the evidence that each of these propositions has been proved, then your verdict should be for the plaintiffs, but, if, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved, then your verdict should be for the defendant." (Defendant's Instruction No. 9.)

Plaintiff's given instruction 17 quoted above, is a paraphrase of the court's language in Suvada v. White Motor Co., 32 Ill2d 612, 210 NE2d 182. Because it is a paraphrase of such language, defendant argues that it was erroneously given on the authority of Spiezio v. Commonwealth Edison Co., 91 Ill App2d 392, 235 NE2d

323. Defendant also argues that a "condition" is not a "defect" and therefore, plaintiffs given instruction creates liability without requiring proof of a "defect" contrary to the basis of a manufacturer's liability.

█ The principal sources of jury instructions are prior court decisions. Within the context of a particular case, the principles announced by the court may be either too broadly or too narrowly stated to provide that neutrality or generality of principle appropriate to jury instruction. Thus, it is not the paraphrasing which renders the instruction improper but rather that the general principle requires elaboration, refinement or modifiction. An instruction is not erroneous merely because it paraphrases language of a prior opinion.

█ In Suvada v. White Motor Co., supra, the court deliberately adopted the unreasonably dangerous condition test as the basic principle of product liability. We believe the principles enunciated in Suvada are appropriately embodied in a burden of proof instruction such as plaintiff's number seventeen. The fact that an instruction similar to defendant's instruction number nine was held not to be reversible error when given at the request of plaintiff in Dunham v. Vaughan, 86 Ill App2d 315, 229 NE2d 684, does not thereby support the assertion that plaintiff's instruction in this case is erroneous. The nature of the unreasonably dangerous condition and the issues relating thereto can be adequately set forth in the issues instruction.

█ We do not approve giving two burden of proof instructions. Osmon v. Bellon Const. Co., 53 Ill App2d 67, 202 NE2d 341. It was the defendant who insisted upon the second burden of proof instruction and it cannot now be heard to complain of any resulting confusion or error.

Defendant next contends that the court erred in unduly restricting its cross-examination of certain of plaintiff's witnesses. In particular, defendant argues that the court

erred in refusing to permit the fact that certain of the witnesses were employees or agents of insurance companies to be shown.

Plaintiff was an employee at the time of his injury and was entitled to workmen's compensation. Plaintiff's employer carried workmen's compensation insurance, and in view of the substantial nature of the possible claim, the insurer undertook an immediate investigation which included the employment of investigators and experts.

██ Anticipating that defendant might endeavor to impeach certain of plaintiff's witnesses on account of their employment by an insurance company, plaintiff sought and obtained a pretrial order which prohibited the disclosure of the fact of insurance or questions designed to elicit such facts. The order permitted any witness' interest or bias to be shown generally, as long as it was not specifically related to insurance.

The facts and procedure employed by the trial court in the case at bar are indistinguishable from those in Sweeney v. Matthews, 94 Ill App2d 6, 236 NE2d 439. The court in Sweeney recognized the desirability of avoiding the prejudice which might be engendered by the disclosure of insurance, as well as the necessity of permitting a witness' credibility to be appropriately questioned. The court approved a limitation similar to the one in the case at bar as meeting both objectives. See also Guardado v. Navarro, 47 Ill App2d 92, 197 NE2d 469. The trial court's action was proper.

Defendant next argues that the verdict of the jury was excessive and was based on passion and prejudice. In support of such argument, defendant cites Parnham v. Carl W. Linder Co., 36 Ill App2d 224, 183 NE2d 744, and Campbell v. Chesapeake & Ohio R. Co., 36 Ill App2d 276, 183 NE2d 736, in which verdicts of $60,000 were approved where the plaintiff lost the sight

of one eye. It should be observed that in Campbell v. Chesapeake & Ohio R. Co., supra, no claim was made that the amount of the verdict was excessive.

Plaintiff was forty-two years of age at the time of the incident, had a life expectancy of 31.6 years. His earnings as a sheet metal worker in the year preceding his injury were approximately $7,000. His hospital and medical expenses were not large. He was not able to resume his previous employment as a sheet metal worker and between the time of his injury and the time of trial, he was unemployed for a substantial portion thereof. At the time of trial his income was approximately $3,000 a year. The evidence also indicates that the hourly rate for sheet metal workers had increased since the date of plaintiff's injury and his income would have increased had he been able to resume his former employment. It also appeared from the evidence that prior to this incident plaintiff had impaired vision in the eye not injured in this incident.

■ ■ No principle seems more firmly established in the law than that the determination of damages in a personal injury case is a matter within the peculiar competence of a jury. No arithmetical computation of damages is possible, and the verdict for a particular injury in another case is only of general relevance. The principal question is how a particular injury has or will affect the person sustaining such injury. In Parnham v. Carl W. Linder Co., supra, the verdict of $60,000 was affirmed, even though plaintiff was able to resume his employment and his income was the same or greater than his income prior to his injury.

■ In the case at bar, we believe that the verdict for $107,840 is within the range of and supported by the evidence. Under the circumstances, plaintiff's loss of income both past and potential was substantial and when

such facts are viewed with the other intangible elements of damage, we do not believe that the verdict can be said to be excessive.

Lastly, we hold the trial court properly directed a verdict in favor of Cyclone Blow Pipe Company, the third-party defendant. The cases cited by defendant, Campbell v. Chesapeake & Ohio R. Co., 36 Ill App2d 276, 183 NE2d 736, Blaszak v. Union Tank Car Co., 37 Ill App2d 12, 184 NE2d 808, Muhlbauer v. Kruzel, 78 Ill App2d 343, 223 NE2d 227 and Boston v. Old Orchard Business Dist., 26 Ill App2d 324, 168 NE2d 52, offer no support for its contention that the evidence supported any theory of indemnity.

For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

Judgment affirmed.

RYAN, P. J. and ALLOY, J., concur.