SHELDON LIVESTOCK COMPANY, INC., Plaintiff-Appellee, *v.* WESTERN ENGINE COMPANY, Defendant-Appellant.

(No. 72-107; ▇▇▇▇▇▇▇▇▇▇▇▇▇▇)

Second District—September 17, 1973.

Gates W. Clancy, of Geneva, for appellant.

Donovan, Dichtl, Atten, Mountcastle & Roberts, of Wheaton, for appellee.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

The plaintiff, Sheldon Livestock Company, Inc., filed a three count complaint against Western Engine Company as agent, and Detroit Diesel Company as principal, seeking damages for repairs and loss of time and use of its truck-tractor as the result of an overhaul of the truck by Western Engine Company. Count I alleged negligent repair; Count II alleged breach of contract to perform in a workmanlike manner; and Count III alleged breach of express warranty. Detroit Diesel's motion for summary judgment was granted on the basis that Western Engine Company was not its agent. The case proceeded to trial, was submitted to the jury on only the first two counts, and resulted in a verdict for plaintiff in the amount of $5,350. Defendant appeals from the judgment entered on the verdict.

Defendant contends: (1) That the court erred in instructing the jury on both contract and negligent theories, claiming that this prejudicially allowed two avenues of recovery for breach of the same alleged duty of ordinary care; (2) that the testimony of plaintiff's expert witness on causation lacked proper foundation, and further, applied standards of care which were neither universal nor applicable for defendant's locality; (3) that plaintiff failed to prove freedom from contributory negligence by failure to produce evidence of proper use, maintenance or repair for the 90,000 miles the engine ran after defendant's overhaul; and (4) that undocumented evidence of loss of profits was improperly admitted.

The evidence shows that in December, 1969, defendant performed an overhaul on the Detroit Diesel engine of plaintiff's truck at a cost of $3,479.29. It is agreed by both parties that no main bearing stabilizers were installed during this repair. Approximately 10 months and 90,000 miles later, the truck broke down. Carroll Bole, the major stockholder and principal operating officer of plaintiff company, testified that the truck broke down on the highway, and was towed some 25 miles to the International Harvester dealer in Indianapolis, Indiana. Bole went there and saw the engine completely out of the frame, disassembled, and lying on the floor. He saw that the crankshaft was broken. The International

Harvester dealer replaced broken flywheel bolts, but Bole did not know if they installed a new flywheel. He said the flywheel was not broken but the holes where the bolts went were worn to the point that they thought a new flywheel should be installed. (In plaintiff's briefs it is conceded that a new flywheel was installed.) The clutch was also overhauled. The truck was then towed to Nixon Detroit Diesel in Nashville, Tennessee, where the crankshaft was repaired at a cost of $5,265.52. Bole also testified that during the time between defendant's work and the later breakdown the truck was used for hauling livestock, as it had been before the repairs.

Among the exhibits admitted in evidence were photographs of the engine as it lay disassembled at the International Harvester shop together with a bill. The bill contained the legend "Removed broken flywheel bolts & studs. * * * Used new flywheel bolts and dial pins (flywheel furnished by customer)."

Lee Lovelady, the general service manager for Nixon Detroit Diesel, also testified for the plaintiff. He stated, over defendant's objection that there was no proof the engine was in the same condition as on the date of its breakdown, that he examined the engine at his shop and found that the main bearing bolt to the crankshaft was broken. He said there were no stabilizers and that in 1968, pursuant to Detroit Diesel Company publications dated December 1966 and January 1967, which stated that stabilizers "are being used" to increase the rigidity of the two main bearing caps, he did not do an overhaul without installing main bearing cap stabilizers. He stated that the purpose of main bearing cap stabilizers is to stabilize the two rear main bearings from vibrating and receiving undue stress. Over objection he stated his opinion that the broken bolt could and would be caused by defendant's failure to install the stabilizers during the overhaul. He said that without them the vibrations of the engine caused the main bearing cap to loosen, causing the bolts to break, and it is then a matter of time until the crankshaft breaks. He said that he did not remember the condition of the flywheel. Asked on direct examination whether the condition of the flywheel was important in regard to the cause of the crankshaft breaking, Lovelady testified:

"A. The condition of a loose flywheel being run along a period of time, it sets up a vibration which in turn would break the main bearing bolt and in turn would break the crank.

Q. Well, does the loosening of the flywheel, is there any causal relationship between the failure to have a main bearing cap stabilizer and the loosening of the flywheel?

A. It definitely would have a lot better chance if the stabilizer was on it.

Q. Why do you say that?

A. Well, here again you are stabilizing the top of your main bearings to the point where they are held more rigid on both sides. There was no working problem from one side to the other."

On cross-examination, Lovelady said that the bad clutch or loose fly-wheel could cause vibrations in the crankshaft, and that these were general maintenance items. The cross-examination continued:

"Q. The place where the crankshaft broke is over here at the left of the picture, isn't it? Three places removed, isn't that right?

A. There is loss of support here. The main bearing loosens up and the crank starts turning inside the block and there is no support all the way up. That's what caused it to break.

Q. Have you ever had occasion in your years of experience with these to have a crankshaft break and then cause the bolt to break?

A. No.

Q. If the crankshaft breaks first, the main bearing cap is going to go? Something is going to go?

A. As a usual thing it does. I don't know of any occasion.

Q. Have you ever had occasion to have in your shop, sir, these units with stabilizers on them where the bolt is broken?

A. Yes.

\* \* \*

Q. If I understand you correctly, sir, then, you are not giving an opinion as to the order in which the crankshaft or the bolt broke, or you are?

A. I am.

Q. What is your opinion?

A. The bolt broke, loss of support and the bearing burned and the crank broke.

Q. On what do you base that opinion?

A. From my own experience as technical engineer for Detroit Diesel. As I told you before, I have 34 dealers. I travel with the technical engineers from each dealer and we inspect parts of these kind. And this is what I base my opinion on.

\* \* \*

Q. Sir, why do you say that the bolt broke first and the crankshaft broke later, did you make an examination of them by any metal tests which broke first or second?

A. No metal tests.

\* \* \*

Q. And in making your opinion, were you aware of the fact that

the flywheel had in fact been replaced on this engine in Indianapolis before it was brought to you?

A. No.

Q. And the fact that the flywheel was broken and bolts in connection therewith were broken, would that affect your opinion?

A. I don't believe it would in this case, no, sir.

Q. And of course the vibrating of the flywheel could cause the bolts to break?

A. No, sir.

Q. With or without the stabilizers, couldn't it?

A. That is very possible."

On redirect-examination Bole testified that the normal life expectancy of an engine after a complete out of frame overhaul would be between 400,000 and 500,000 miles.

William Bassett, the service foreman at Western Engine Company, testified for the defense that although he was aware of the Detroit Diesel Company pamphlets, stabilizers were not installed in plaintiff's truck because the planned use of the truck for hauling livestock did not require them. He said that some pamphlets of Detroit Diesel Company required certain parts, but that the pamphlets in question did not "require" the use of stabilizers. He said the breakage of the crankshaft bolts could be the result of vibration caused by the clutch or flywheel.

Defendant primarily contends that Lovelady should not have been permitted to testify to the cause of the breakdown because plaintiff failed to establish that the condition of the truck remained unchanged between the breakdown and Lovelady's examination. (*Rotche v. Buick Co.* (1934), 358 Ill. 507, 516-518; *Woodrick v. Smith Gas Service, Inc.* (1967), 87 Ill. App.2d 88, 92.) Plaintiff counters that the pictures admitted in evidence show that the bearing bolt and crankshaft were broken when observed in Indianapolis, and that it is admitted by defendant that no stabilizers were installed. Thus, plaintiff contends that it is established that no change occurred.

Plaintiff is correct in so far as Lovelady's testimony relates to defendant's negligence in not installing stabilizers during the overhaul. It is admitted that there was no change as to the presence or absence of stabilizers from the time of the accident until the expert witness saw the parts. If the presence or absence of stabilizers could give a sufficient factual foundation upon which to base an expert's testimony as to the cause of the broken crankshaft, we would have little difficulty in accepting this proof even though the witness retreated from his initial position of absolute certainty. However, on the total record of Lovelady's

testimony, it would appear that no proper foundation was laid from which he could give an opinion in terms of the probable and not merely of the possible that the absence of stabilizers caused the breakdown. The question to which he responded was not a hypothetical, but was based on his personal inspection of the damage. Yet Lovelady did not know that when the truck was in Indianapolis, the engine was disassembled, and the clutch, flywheel and flywheel bolts were replaced. He did not know that the flywheel bolts were broken. These gaps in his knowledge are important since he stated on both the direct and cross-examination that a loose, vibrating flywheel could break the main bearing bolt and in turn cause the crankshaft to break. He also said that a bad clutch could cause vibrations in the crankshaft.

■■ It is thus evident that the condition of the engine had changed before Lovelady's inspection, and that the change was such as could effect a determination of the cause of the accident. The cases cited by plaintiff are distinguishable on their facts. (*Gass v. Carducci* (1962), 37 Ill.App.2d 181; *Noncek v. Ram Tool Corp.* (1970), 129 Ill.App.2d 320.) The admission of Lovelady's testimony as to the cause of the breakdown was reversible error.

To assist the court on retrial, we will briefly refer to certain other questions which defendant has raised.

■■ Defendant's contention that the jury should not have been instructed on both contract and negligence theories is based on what we consider to be an improper premise that because there is a common duty to use ordinary care, the theories of recovery are identical. We agree with the argument of the plaintiff that the failure to perform a contract in a good and workmanlike manner is the same as negligent performance. "Workmanlike" means a proper, safe and non-negligent manner of doing something. It describes an ordinary standard of care, the breach of which standard is equivalent to negligence. (*Italia Societa Per Azioni di Nav. v. Oregon Stevedoring Co.* (9th Cir. 1962), 310 F.2d 481, 484.) However, while the duty under either theory is the same, the non-performance of a duty is only one of the requirements for the application of either theory of recovery. Under the contract theory, there could be no recovery unless it were first established that a contract existed, while, of course, this finding would not be necessary for recovery under negligence principles. In addition, recovery under the negligence theory required freedom from contributory negligence, proof which would be unnecessary in the contract action. Since both theories were pleaded by plaintiff and there was evidence in the record supporting each theory, the judge properly instructed the jury under each theory.

Defendant has also argued that Lovelady's testimony as to methods

used in his shop in Nashville, Tennessee, is irrelevant and incompetent with regard to the standards to be followed in defendant's shop in Addison, Illinois. In support of this argument defendant cites *Bacon v. Walsh* (1913), 184 Ill.App. 377, a medical malpractice case holding that physicians are held to that degree of knowledge and skill which the average physician under the circumstances in that locality would bring to a case. The medical locality rule was based on the rationale that a doctor in a small community, not having the same opportunity and resources for keeping abreast of the advances in his profession, should not be held to the same standard of care and skill as that employed by physicians in large cities. See 37 A.L.R.3d 423-424.

■■ The medical locality rule has not been applied in other cases of negligence. Even if applicable it would not render Lovelady's testimony inadmissible. The shops of both defendant and Lovelady were authorized repair outlets for Detroit Diesel engines, the type involved here. Both shops regularly received publications from Detroit Diesel Company, and both had received the pamphlets pertaining to the use of stabilizers. There is nothing in the proof to indicate that a Detroit Diesel engine works differently in Addison than in Nashville. Lovelady testified that he worked only on this type of engine and his shop repaired or overhauled between 1000 and 1200 such engines a year. He was well qualified to testify as to such engines. See *Holcomb v. Magee* (1920), 217 Ill.App. 272, 282.

Defendant has also contended that the plaintiff should not have been allowed to testify as to lost profits without producing his corporate books for in-court examination. On re-trial the plaintiff, of course, must comply with the best evidence rule. See *People ex rel. Wenzel v. Chicago & N.W. R.R. Co.* (1963), 28 Ill.2d 205, 213.

We do not discuss other questions raised by the parties which are not likely to occur on a re-trial.

The cause is reversed and remanded for a new trial.

Reversed and remanded.

GUILD, P. J., and T. MORAN, J., concur.