**Fred L. Taylor and Ralph Rosenberger, Plaintiffs-Appellees, v. The Carborundum Company, a Corporation, Defendant-Appellant.**

Gen. No. 52,330.

First District, Third Division.

February 20, 1969.

Rehearing denied May 1, 1969.

Caryl P. Bonotto, John W. Kearns, Jr., and Kirkland, Ellis, Hodson, Chaffetz & Masters, of Chicago, for appellant.

Lawrence P. Hickey, Roger J. Boylan, and John J. Kennelly, of Chicago (Sidney Z. Karasik, of counsel), for appellees.

MR. JUSTICE DEMPSEY delivered the opinion of the court.

The plaintiffs, Fred Taylor and Ralph Rosenberger, were injured when a grinding wheel manufactured by the defendant, The Carborundum Company, shattered. They commenced separate actions against the defendant which were consolidated for trial. The jury returned a verdict in their favor and awarded Taylor $50,000 and Rosenberger $1,500 damages.

The defendant's major contention is that it is entitled to an outright reversal because of the plaintiffs' failure to prove certain elements necessary for recovery under a strict products liability theory. In the alternative, it points to alleged irregularities which occurred in the course of the trial and requests that the cause be reversed and remanded for a new trial because of them. The extent of the plaintiffs' injuries and amount of damages awarded them are not questioned.

On the day of the accident, July 23, 1959, Taylor and Rosenberger were employed as ironworkers by the City of Chicago and were engaged in general repair work on a bridge over the Calumet Canal. Both were experienced ironworkers, having served several years in the trade. Shortly after lunch the plaintiffs assembled tools to be used in their work. Taylor withdrew a sledgehammer from a toolbox and sawed off a portion of its handle.

This was done so that the hammer could be utilized in close-quarter situations. After the sawing, there remained a few rough edges on the handle which needed to be removed and Rosenberger suggested using a grinding machine for that purpose. Taylor picked up a nearby portable, pneumatic machine which had mounted on it an emery grinding wheel. The wheel, eight inches in diameter and about an inch thick, was made by Carborundum. Taylor ran the grinder for a few seconds to clear water condensation out of the air hose and noticed nothing unusual about the machine. It was running normally at its full speed, which was 4,500 revolutions a minute. He then placed the grinder on a keg for support and reactivated it. Rosenberger faced the side of the wheel with the hammer in his hands; before he could bring its handle into contact with the spinning wheel, or just after he had done so, the wheel came apart with such force that both men were knocked down.

Rosenberger was not seriously injured. Part of the wheel struck his leg; the impact forced him to the ground and he suffered a broken finger in the fall. Taylor was not as fortunate. Another part of the wheel tore into the upper calf of his left leg. The peroneal nerve was lacerated which has resulted in a complete and permanent paralysis of the anterior portion of his ankle and foot.

Shortly after the accident the plaintiffs' foreman tested the grinding machine to see if it still functioned. He found that it did and that it operated properly. All of the wheel except its hub, which was held in place by a washer and nut, had separated from the machine. The foreman was able to locate only a portion of the wheel and he found this piece about forty feet from the site of the accident.

■ The original complaint was premised upon a breach of warranty theory. At the close of their case the plaintiffs were permitted to file an amended complaint

containing two counts: strict liability and negligent failure to warn. The trial court did not err in allowing the amended complaint to be filed. See Sweeney v. Matthews, 94 Ill App2d 6, 236 NE2d 439 (1968).

█ In order to sustain a claim against a manufacturer under a strict liability theory a plaintiff must prove that his injury resulted from a condition of the product, that the condition was unreasonably dangerous and that it existed at the time it left the manufacturer's control. Suvada v. White Motor Co., 32 Ill2d 612, 210 NE2d 182 (1965).

To prove the grinding wheel defective, the plaintiffs called as an expert witness a qualified chemist. The witness testified that he examined the piece of the wheel that had been recovered and subjected it to four tests— only one of which was significantly relevant to his ultimate opinion that the wheel was defective. This test was conducted by removing three fragments from divergent areas of the larger piece, weighing them, placing them separately into a container of water and measuring how much water was displaced. In this manner the density of each piece was ascertained and the average density computed. The fragments differed in density. One was more and two were less dense than the average. Based upon this test it was the opinion of the witness that there existed a causal relationship between the wheel's falling apart and the variations in the wheel's density.

The defendant objected to the competency of the witness in the trial court and repeats the objection in this court. It is the defendant's position that the witness did not qualify as an expert and without his testimony there was a complete failure of proof that the grinding wheel was defective when it left the defendant's control.

█ The test of competency for an expert is whether or not he exhibits sufficient knowledge of the subject matter to entitle his opinion to go to the jury. Piacentini v. Bonnefil, 69 Ill App2d 433, 217 NE2d 507

(1966). A trial court has broad discretion in determining if a witness has been qualified as an expert. Northern Illinois Gas Co. v. Wienrank, 66 Ill App2d 60, 213 NE2d 411, (1965). The witness was a chemist with many years experience in the testing of materials and had examined grinding wheels on prior occasions. He was offered as an expert only in the field of chemistry and his testimony on direct examination was limited to this area. It was not necessary, as the defendant claims, that the witness also possess expertise in the manufacture and use of grinding wheels. The trial court did not abuse its discretion in permitting the witness to testify and did not err in denying the defendant's motion to strike his testimony.

In further support of its position that there was a failure to prove the wheel defective, the defendant has directed our attention to two product liability cases decided in favor of the defense: Shramek v. General Motors Corp., 69 Ill App2d 72, 216 NE2d 244 (1966) and Jakubowski v. Minnesota Mining and Mfg. Co., 42 NJ 177, 199 A2d 826 (1964). In each of these cases the allegedly defective product was unavailable at the trial and the plaintiff was unable to present direct evidence that a defect existed in the product when it left the manufacturer's control. He was also unable to negate other possible causes of the product's failure. The discussions in both opinions pointing to possible causes of the product failure other than a defect in manufacture were premised upon the absence of direct proof of a defect. Such is not the situation in the instant case where, by means of expert testimony, direct proof of a defect in the product was adduced with the reasonable inference left to be drawn by the jury that it came into existence at the time of manufacture. There was, therefore, sufficient evidence to allow the question of a defect to go to the jury, for a plaintiff is not required to prove his case beyond a reasonable doubt or disprove every theory supporting a

19

cause of failure other than the one alleged. Foster v. Union Starch & Refining Co., 11 Ill App2d 346, 137 NE2d 499 (1965).

The defendant also argues that the plaintiffs failed to prove another element necessary for recovery: namely, that the wheel was used in the manner and for a purpose for which it had been designed and intended.

■ The plaintiff presented adequate proof that it was customary to use grinding wheels to smooth tool handles. Taylor, Rosenberger and two other ironworkers testified that it was customary and usual in their trade to use grinding wheels to remove rough edges from hammer and ax handles. There was no evidence to the contrary. The plaintiffs also presented proof that the disc was correctly mounted on the machine. Taylor testified that he had mounted similar Carborundum wheels and that there was nothing unusual about the wheel's position on the machine. Additional proof was offered on this subject but it was objected to by the defendant. The plaintiffs called as a witness the ironworker who had placed the wheel on the machine but the defendant objected to his testifying because his name was not among the witnesses listed in the plaintiff's answer to the defendant's interrogatories. After a conference in chambers the witness was withdrawn.

The defendant argues that the plaintiffs were using an incorrect wheel on an antiquated machine. According to the defendant it was clearly shown that the plaintiffs used a vitrified wheel eight inches in diameter with a recommended maximum speed of 3,600 revolutions per minute (rpm) on a machine which operated at 4,600 rpm; that only vitrified wheels up to seven inches in diameter were supposed to be used on the machine and that the machine was twenty years old although its recommended life was only five years.

The evidence, however, was not as clear-cut on the above two points as the defendant maintains. First, as to

the machine: the machine was not introduced into evidence; it had been transferred to other jobs and could not be located. The absence of the machine complicated the trial and the complication was aggravated by an observation made by the plaintiffs' attorney in his opening statement. He told the jury that while the machine was not available, photographs of an identical machine would be presented. He was soon shown to be mistaken. His first witness, Taylor, looked at the pictures and said that the machine depicted was similar to, but not the same, as the one he and Rosenberger had used. He noted these differences: the machine in the photographs had no handle and the trigger was in a different location, and the wheel on the machine was cup-shaped—a wheel used for surface grinding where the grinding is done with the face of the wheel rather than the edge. Another witness pointed out an additional difference: the hub shaft on the depicted machine was round whereas the one on the machine used by the plaintiffs was square. The machine in the photograph was identified as an Ingersoll Rand, model 4K; the one used by the plaintiffs was also an Ingersoll Rand, but the model number was not known.

Despite these differences the defendant proceeded on the theory that the machines were the same. There was testimony that the instruction book for model 4K recommended that it be used with a six-inch cupped wheel. It was established that the speed of the 4K model was 4,600 rpm and that a label on the machine warned that it was not to be used with vitrified wheels more than seven inches in diameter. One witness for the defendant testified that if an eight-inch vitrified wheel with a recommended maximum speed of 3,600 rpm were used on the 4K model the wheel would rupture due to overspeed. Another witness, the Chicago branch manager of the Ingersoll Rand Company's tool division, testified that the recommended life of a 4K model was five years, but that the one in the pictures was over twenty years old.

Since it was apparent that the machine used by the plaintiffs and the 4K machine in the pictures were not identical, the testimony as to the age and useful life of the 4K model was largely irrelevant. For the same reason, the testimony concerning the type and size of the wheel recommended for use on the 4K model was equally irrelevant. At best, under the evidence submitted, a jury question arose as to the weight to be given the conflicting theories.

Second, as to the wheel: according to the plaintiffs' witnesses, the wheel which disintegrated was eight inches in diameter and rated at 4,500 rpm. They testified that this was the standard size and speed of wheels used on construction jobs. The job foreman testified that two weeks before the accident he requisitioned and received six such wheels. The general foreman of the ironworkers testified that one of his duties was to order grinding wheels for his men and that he had ordered 4,500 rpm wheels as long as he could remember. He recounted that at one time a box of fifty wheels was delivered but he had sent it back because the wheels were rated at 3,500 rpm. However, the same witness stated that a wheel, subsequently introduced into evidence by the defendant, was like those he ordered in 1959. This wheel was an eight-inch Carborundum wheel drawn from stock. A safety engineer for the Carborundum Company testified that the labels on both sides of the wheel were the same as those on wheels manufactured by it in the years 1957, 1958 and 1959. The label on the front bore the defendant's name, gave the wheel's dimensions, stated that its maximum speed was 3,600 rpm and called attention to another label on the reverse side. The second label contained detailed safety directions and stated that the wheel was to be used in conformity with the American Safety Code for the Use, Care and Protection of Abrasive Wheels and was to be visually inspected and sound-tested before being mounted.

22

On the other hand, the piece of the wheel found after the accident was introduced into evidence by the plaintiffs. Attached to it was an incomplete Carborundum front label. There was nothing on this label except the defendant's name. However, this name was in a different location and the lettering was of a different color than on the wheel introduced by the defendant. Further, the defendant's safety engineer testified that Carborundum made an eight-inch wheel suitable for use at 4,500 rpm and had been making such wheels for many years, including the nineteen fifties. This was corroborated by a mechanical engineer who testified for the defendant as an expert on the stresses and breakage of grinding wheels. He stated that in 1959 and prior thereto manufacturers of abrasive wheels (which would include Carborundum) made an eight-inch wheel suitable for use on a portable grinding machine that operated at 4,500 rpm. This same witness stated that grinding wheels have a safety factor built into them; that the safety factor of a wheel designed to operate at 3,600 rpm would be twice that number of revolutions—so that a wheel designed to operate at 3,600 should operate safely up to 7,200 rpm.

█ From the above evidence the jury could reasonably have concluded that the wheel introduced by the defendant was not of the same type as the one involved in the accident; that the latter wheel was rated at 4,500 rpm and was used on a machine which rotated at that speed. The jury could also have concluded that the wheel was similar to the one introduced by the defendant and was rated at 3,600 rpm but, because of the safety factor, the wheel should have been safe at a speed of 4,500 rpm and was thus still being used in a manner for which it was designed and intended. In either event, there was sufficient evidence to allow the question to go to the jury. Likewise, since there was testimony that labels often came off the wheels and that there was no label on the rear side of the piece of wheel involved in the accident,

23

and since the rear label is the one containing the instructions on use and the reference to the Safety Code, it was for the jury to decide if the defendant was negligent in failing to warn.

The defendant's final argument in support of its contention that a verdict should have been directed in its favor is that the plaintiffs were guilty of contributory negligence as a matter of law. The argument proceeds that the plaintiffs, as experienced workmen using tools of their trade, were negligent in not testing the grinder and the wheel before using them, in using a flat wheel on a machine designed for a cupped one, in using an eight-inch wheel instead of a seven-inch one, in using the wheel without a sufficient guard and in not standing aside as they started the wheel. Some of these points have been considered and the others are not relevant to a product liability case. There was no evidence that either plaintiff was aware of a defect in the wheel, that he used it in an unreasonable manner or that he used it for an unintended purpose. The defendant's motions for a directed verdict and for judgment notwithstanding the verdict were properly denied.

The trial irregularities urged by the defendant as grounds for a new trial are: erroneous evidentiary rulings and improper remarks by the trial court, prejudicial comments and argument by counsel for the plaintiffs, and an incorrect instruction given at the request of the plaintiffs.

 The first of the evidentiary rulings claimed to be erroneous was allowing the plaintiffs' expert witness to testify. This subject has been previously discussed and decided adversely to the defendant. The next is restricting the cross-examination of the expert witness as to the contents of the Safety Code for abrasive wheels. The defendant cites Darling v. Charleston Community Hospital, 33 Ill2d 326, 211 NE2d 253 (1965) as authority for the proposition that it is permissible for an expert to be cross-

24

examined on treatises or periodicals other than those with which he is familiar or that were considered by him in arriving at his opinion. The rule in Darling, however, is limited in its application to writings in the field where the witness has demonstrated his expertise. In the instant case the witness was offered as an expert only in chemistry and, admittedly, was not an expert in the use of grinding wheels. It was not improper, therefore, for the trial court to limit the cross-examination of the witness to his own specialty.

It is also claimed that the trial court erred in not allowing defense counsel to elicit testimony and introduce evidence relating to the use and parts of the Ingersoll Rand 4K grinder. As previously mentioned, this machine was depicted in the plaintiffs' exhibits, but the unrebutted testimony showed that it was not the same machine in use at the time of the accident. Any inquiry into the use and parts of the grinder appearing in the pictures, therefore, would not have been relevant.

Nor did the trial court err in sustaining an objection to the defendant's product safety engineer testifying as to the tests grinding wheels were subjected to at the defendant's factory. In the decision adopting strict liability in this jurisdiction, Suvada v. White Motor Co., 32 Ill2d 612, 210 NE2d 182 (1965), the court quoted with approval section 402A of the Restatement of Torts 2d, sub-section (2) of which is as follows:

"(2) The rule stated in subsection (1) [strict liability] applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product."

In Sweeney v. Matthews, 94 Ill App2d 6, 236 NE2d 439 (1968) this court said: "A manufacturer can be most careful in making and testing his product, but . . . can be held accountable if a defect was . . . in the product

at the time it was made . . . ." It is evident from the foregoing that an inquiry into the general method of manufacture and testing of a product would serve no useful purpose in a strict liability action.

 It is further urged that Taylor should not have been permitted to testify that the wheel was properly mounted. Taylor was an ironworker of many years' experience. Although he had not placed this particular wheel on the grinder, he had mounted wheels many times in the past and it was not error to allow him to testify that there appeared nothing unusual about the disc's position on the grinder.

The final contention pertaining to the evidentiary rulings is that the defendant should have been permitted to impeach the plaintiffs' immediate supervisor with two statements he had made in a deposition. We have examined the so-called impeaching statements and find no essential inconsistency between them and the witness's testimony at the trial. See Garrett v. S. N. Nielsen Co., 49 Ill App2d 422, 200 NE2d 81 (1964).

Complaint is made that the trial judge made improper remarks in the presence of the jury. The principal remarks criticized were in connection with the testimony of the plaintiffs' expert witness. This witness was asked whether there was a causal relationship between the variations in density found in the wheel and its sudden disintegration. The defendant's attorney objected on the grounds that the witness was unqualified as an expert and his examination of the piece of the wheel was not sufficient upon which to base an opinion. In overruling the objection, the court said: "No, I think he made a very good examination, and your objection is overruled." Later, in sustaining an objection to the scope of the witness's cross-examination, the court remarked: "Sorry, Counsel. I think the man has been a very able and competent witness . . . ."

The court's comments invaded the province of the jury and could have influenced its appraisal of the witness and its evaluation of his testimony. However, the possible impact on the jury under the circumstances of this case must be considered minimal. If the jury had to choose between this witness and his testimony and another expert and his opposing testimony, the court's complimentary references to the plaintiffs' witness might have tipped the scales in his favor. But such was not the case. The result of the witness's chemical examination of the wheel was uncontradicted; his testimony that the fragments he examined varied in density was undisputed; his conclusion that these variations could have caused the wheel to shatter was unrebutted.

Moreover, the Carborundum Company had the same opportunity to test the remaining piece of the wheel as did the plaintiffs. The plaintiffs' attorney had delivered the piece, and the fragments examined by the expert, to the defendant's attorney in 1961; he, in turn, sent them to Carborundum. When they were returned to the plaintiffs' attorney they were not in the same condition: a pie-shaped segment had been cut from the larger piece and this segment was missing. The jury could have inferred from this that Carborundum had removed this segment for testing purposes. But no testimony contrary to the plaintiffs' expert was presented. The defendant's attorney attempted to explain in his argument to the jury and in his oral argument to this court why there was no such testimony. He said that the man who made the examinaiton for Carborundum had died. There was no evidence supporting this statement and upon objection at the trial it was withdrawn. Even if there had been an evidentiary foundation for the attorney's explanation it would not have been satisfactory. The man referred to died in 1964. The trial was held in 1967. There could easily have been further examinations if Carborundum

27

wished them, and the fact that it did not and presented no proof at all in refutation of the plaintiffs' witness warranted the inference that it had no contrary findings. Under these circumstances, the remarks of the court, while improper, were not prejudicial.

 We have examined the other complained-of remarks in their proper context and find them to be non-prejudicial. Wide latitude must be allowed the trial judge in conducting a trial. It is only where his conduct or remarks are of such a nature as would ordinarily create prejudice in the minds of the jurors that they constitute reversible error. Piechalak v. Liberty Trucking Co., 58 Ill App2d 289, 208 NE2d 379 (1965); Reske v. Klein, 33 Ill App2d 302, 179 NE2d 415 (1961).

 The plaintiffs' attorney made certain comments in his argument to the jury which the defendant claims had the effect of denying it a fair and impartial trial. In both his opening and closing statements counsel for the plaintiffs related that Taylor had received over $10,000 in benefits from the City of Chicago which would have to be repaid out of any sum recovered from the defendant. The statements were imprudent and should not have been made. However, on neither of the occasions when the subject was mentioned were objections interposed. The point is, therefore, deemed waived before this tribunal. Copeland v. Johnson, 63 Ill App2d 361, 211 NE 2d 387 (1965). With one exception, the other allegedly prejudicial comments complained of were not objected to and are likewise waived. The only comment properly preserved for appeal occurred near the termination of the closing argument when the plaintiffs' attorney, referring to defense counsel's argument, stated:

> "Again, Ladies and Gentlemen, I feel . . . that your intelligence has been insulted. He has misrepresented every fragment of testimony about which he has just argued almost without exception. He depends on this dramatic appeal."

28

At this juncture the defendant objected and the trial court warned the plaintiffs' attorney that he was "going too far." The admonition by the court and the fact that the argument did not digress thereafter, minimized any effect the improper comment may have had on the jury. The defendant suffered no prejudice which would require remandment and a new trial.

The defendant tendered an instruction which read:

> "It was the duty of the plaintiff [sic], before and at the time of the occurrence, to use ordinary care for his own safety. That means it was the duty of the plaintiff to be free from contributory negligence."

The plaintiffs objected to the last sentence and the trial court deleted it. The instruction is contained in section 10.03 of the Illinois Pattern Jury Instructions. The note accompanying this section states that:

> "The last sentence of this instruction is to explain the relationship between the concepts of 'ordinary care' and 'contributory negligence' inasmuch as the latter term is frequently used by counsel in argument to the jury."

The second sentence is merely explanatory of the first and the jury could not have been misled by its exclusion. Moreover, in this case—where the predominant theory was strict tort liability, not negligent failure to warn—an unqualified instruction that "it was the duty of the plaintiff to use ordinary care for his own safety" was beneficial rather than detrimental to the defendant.

The judgment is affirmed.

Affirmed.

SULLIVAN, P. J. and SCHWARTZ, J., concur.