PIONEER HI-BRED CORN COMPANY, Plaintiff-Appellant, v. NORTHERN ILLINOIS GAS COMPANY, Defendant-Appellee.

(No. 72-235; )

Third District—December 28, 1973.

*Rehearing denied February 14, 1974.*

ALLOY, P. J., dissenting.

James T. Ferrini, of Chicago, and Watt C. Johnson, of Princeton, for appellant.

Brunon J. Komosa, of Chicago, and Roger V. Pierson, of Princeton, for appellee.

Mr. JUSTICE STOUDER delivered the opinion of the court:

Plaintiff-Appellant, Pioneer Hi-Bred Corn Company of Illinois, appeals from a judgment entered on the verdict of the jury in favor of Defendant-Appellee, Northern Illinois Gas Company, by the Circuit Court of Bureau County.

Plaintiff owns a plant located less than a mile north of Princeton, Illinois, where corn is processed for resale to farmers. The corn is dried in large portable gas dryers. Defendant, a distributor of natural gas, and plaintiff executed a "Gas Service Contract" in September, 1966 whereby gas was to be supplied to plaintiff at a pressure of approximately 45 pounds per square inch. There were seven dryers in use during 1967, each drawing gas from one of the gas risers or standpipes through a

connecting rubber hose ten feet long. On one of the dryers a six foot hose was connected to the ten foot hose by hose clamps.

In the fall of 1967, plaintiff notified defendant it was not receiving the required 45 p.s.i. but was receiving only 20 to 30 p.s.i. The operation supervisor for defendant, Richard Bergeson, went to plaintiff's plant and after checking the meter house found that the pressure was inadequate. Bergeson and John O'Reilly, defendant's marketing engineer, looked over the dryers, the hoses and equipment to determine whether the system could handle the pressure if a bypass of the regulator were used. They then advised the plant manager at Pioneer, Mr. Kensinger, the only way to increase the pressure and quantity was to bypass the regulator since the regulator acts as a restriction on the flow of gas and reduces pressure by a few pounds. They also advised the pressure could rise to 75 p.s.i. during periods of low usage. After looking at the plaintiff's equipment, Bergeson and O'Reilly concluded it could withstand the higher pressure. Kensinger asked the employees of defendant if damage could result from such pressure and was told the only damage would be to the gas pressure gauge on the dryers. Defendant did not suggest any alternative way to increase pressure.

The regulators were bypassed on September 27, 1967 which allowed the gas to flow uncontrolled into plaintiff's pipes except for a regulator upstream with a 75 p.s.i. setting. One of defendant's employees stopped at plaintiff's plant several times a week to check a chart where the pressure entering the plaintiff's lines was recorded. Until October 2, the pressure varied between 74 p.s.i. and 6 p.s.i. with radical changes in pressure within short time periods. On October 2 the regulators were again put in use and plaintiff was supplied a constant pressure of 45 p.s.i. The pressure began to decrease and on October 12, defendant again put the system on bypass. Thereafter high and variable pressure was supplied up until the evening of October 12 when Bartman, a Pioneer employee on the night shift who inspected the dryers hourly, noticed the dryers were all running hot. He attempted to reduce the heat by turning the temperature control value on each dryer. The 6 foot and 10 foot lengths of hose connecting the one dryer were vibrating and bouncing. Shortly thereafter he heard the hose blow. While he was attempting to turn the shutoff valve, the gas exploded causing a fire which injured Bartman and caused property damage amounting to $211,712 (amount stipulated by the parties).

Plaintiff brought this action to recover for damages to property and equipment allegedly caused by defendant's misconduct. Five counts were alleged upon alternative theories of negligence, wilful and wanton misconduct, breach of implied warranty, liability for ultrahazardous activity

and breach of contract. The count alleging wilful and wanton misconduct was dismissed on plaintiff's motion. The trial court dismissed at the close of all the evidence all other counts except that of negligence. The jury returned a verdict for defendant. The only assignments of error relate to Count I alleging negligence and Count III alleging breach of implied warranty.

Plaintiff's first assignment of error is the trial court improperly dismissed Count III of the complaint. We agree. The issue which has been contested is the sufficiency of evidence to support the allegations in Count III which charge defendant with a breach of implied warranty. Since the court directed a verdict in favor of the defendant on this count of the complaint at the close of all of the evidence, the propriety of the court's ruling must be tested under the *Pedrick* rule, which of course means considering all the evidence in its aspect most favorable to plaintiff. Plaintiff has devoted a substantial portion of its brief to support the position that an action for breach of implied warranty may be brought in the case of the sale of natural gas. Since defendant does not dispute that position taken by plaintiff, we will accept it as the applicable rule in this case.

■■ The plaintiff has also devoted a portion of its brief to justify the form of the products liability count. As indicated, this count is based on implied warranty generally considered a contract theory of recovery, rather than the strict liability in tort theory, illustrated by *Suvada v. White Motor Company*, 32 Ill.2d 612, 210 N.E.2d 182. Again we note the defendant did not object to this count either because of the theory advanced or because of any failure of allegation or proof of any conditions precedent before liability based on breach of implied warranty could be asserted. Consequently, any deficiencies in the sufficiency of the pleading are waived, and this is particularly true where, as in this case, the defendant has not raised the issue on appeal. However, before considering defendant's specific reasons which the court held were sufficient to warrant dismissal of this count of the complaint, namely the lack of evidence to support plaintiff's assertion that the product was defective and caused the damage, it might be helpful to recall a few of the underlying reasons which have contributed to the evolution of products liability theory.

It should be recalled the liability of a manufacturer predicated upon breach of implied warranties is long standing, having its earliest inception and application to the sale of food. Prior to the *Suvada* case, a manufacturer's liability for breach of implied warranties was limited to those parties with whom he contracted or who stood in privity with his contracting party, subject however to some exceptions. These exceptions

were generally couched in terms of products deemed to be inherently dangerous and where such products were inherently dangerous, liability was extended to injured parties who could not claim standing by virtue of privity of contract. As may be gleaned from the precursors of *Suvada*, the concept of an inherently dangerous product was difficult, if not impossible, to apply rationally. Furthermore, the concept did not commend itself as a reasonable policy in this industrial era. The principal import of *Suvada* was to abandon either the necessity for privity of contract or the exception that an inherently dangerous product be involved. In Illinois, we elected to extend the evolving theory of products liability to the tort arena, although continuing to some extent prior ideas of dangerousness by referring to the basis of recovery as depending upon the existence of an unreasonably dangerous condition causing injury. By electing to add a tort theory of liability, Illinois has neither abolished liability predicated on breach of implied warranty nor has it adopted a theory of recovery unrelated to prior theories of recovery based on breach of implied warranty. Many states have expanded a manufacturer's liability for injuries caused by his products by merely expanding the theory of implied warranty and leaving the cause of action as one essentially based on contract. Other jurisdictions, such as Illinois, have sought to achieve the same effect by recognizing the liability as based on tort but characterize the tort as one of strict liability rather than of negligence. "* * * [T]he strict liability theory is essentially the liability of implied warranty divested of the contract doctrines of privity, disclaimer and notice. See Kessler, *Products Liability*, 76 Yale L.J. 887, 928; Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)*, 69 Yale L. J. 1099, 1143; and Lascher, *Strict Liability in Tort for Defective Products—The Road to and Past Vandermark*, 38 S.Cal. L.Rev. 30, 46." *Dunham v. Vaughn & Bushnell Manufacturing Co.*, 86 Ill.App.2d 315, 229 N.E.2d 684 (*affirmed, Dunham v. Vaughn & Bushnell Manufacturing Co.*, 42 Ill.2d 339, 247 N.E.2d 401.) What emerges from the theories of products liability is a conceptual framework imposing liability for injuries he could have avoided even though the manufacturer's duty to exercise care is not an explicit issue. In other words, we are not so much concerned with how or why the mouse got into the bottle, but are concerned with the nature of the contents of the bottle and its consequences.

■■ The purpose of the foregoing discussion is twofold. First, the theory of recovery enunciated in the *Suvada* case and followed in subsequent cases did not purport to eliminate an action for breach of an implied warranty where there was a contractual relationship between the parties. Thus, in the case at bar, while the plaintiff might have brought his action based on strict liability in tort, an action for breach of an implied

warranty is an acceptable alternative. The existence of alternative procedures enforcing the same substantive rights was recognized in *Van Winkle v. Firestone Tire & Rubber Co.*, 117 Ill.App.2d 324, 253 N.E.2d 588. Whatever objections the defendant might have had to the form of the action, and in this appeal he has none, could and should have been urged in the trial court where such objections, if any there were, might have been cured by amendment.

■■ The development of products liability theory from the earlier more restrictive breach of implied warranty theory is significant in a second respect. This is, that our concepts of defect, unreasonably dangerous condition and causation are related to and interchangeable with theories of recovery based on breach of implied warranty. For example, the concept of defect itself is often described in the terminology of implied warranty. Traynor, *The Ways and Meanings of Defective Products and Strict Liability*, 32 Tenn. L. Rev. 363 (1965), and Note, *The Application of Implied Warranties to Predominantly "Service" Transactions*, 31 Ohio St. L.J. 580 (1970).

According to defendant, the evidence presented by plaintiff was insufficient to support a breach of implied warranty in a case involving sale of a defective product. First, defendant contends plaintiff failed to prove the existence of a defect. According to the defendant, the gas was not unusual in nature or quality nor did the gas perform in a manner unexpected or unreasonable. On the other hand, the plaintiff claims a defect was proved because the product failed to perform in the manner reasonably expected. Secondly, defendant suggests plaintiff failed to prove the alleged defect was the proximate cause of plaintiff's damage. It is claimed plaintiff must offer evidence to show damage was not caused by something other than the alleged defect and in so doing must show that its equipment was in good working order. Also, defendant contends plaintiff must prove that it was exercising due care.

■■ With reference to the existence of a defect in a product, different models or definitions have been proposed. As may be anticipated in an evolving area of the law, no single definition necessarily includes the entire range of possibilities which might be expected to arise. Our Illinois Supreme Court recently had occasion to consider at length this aspect of products liability and in *Dunham v. Vaughn & Bushnell Manufacturing Co.* 42 Ill.2d 339, 247 N.E.2d 401, the Court made the following observations:

> "Although the definitions of the term 'defect' in the context of products liability law use varying language, all of them rest upon the common premise that those products are defective which are dangerous because they fail to perform in the manner reasonably

to be expected in light of their nature and intended function. So, Chief Justice Traynor has suggested that a product is defective if it fails to match the average quality of like products. (Traynor, The Ways and Meanings of Defective Products and Strict Liability, 32 Tenn. L.Rev. 363 (1965).) The Restatement emphasizes the viewpoint of the consumer and concludes that a defect is a condition not contemplated by the ultimate consumer which would be unreasonably dangerous to him. (Restatement, Torts (Second) sec. 402A, comment g.) Dean Prosser has said that 'the product is to be regarded as defective if it is not safe for such a use that can be expected to be made of it, and no warning is given.' (Prosser, The Fall of the Citadel, 50 Minn. L.Rev. 791, 826.) Dean Wade has suggested that apart from the existence of a defect 'the test for imposing strict liability is whether the product is unreasonably dangerous, to use the words of the Restatement. Somewhat preferable is the expression "not reasonably safe."' (Wade, Strict Tort Liability of Manufacturers, 19 S.W. Law Journal 5, 15.) See also, Dean Keeton, Products Liability-Liability Without Fault and the Requirement of a Defect. 45 Tex. L.Rev. 855, 859."

As observed in *Dunham v. Vaughn & Bushnell Manufacturing Co.,* 86 Ill.App.2d 315, 229 N.E.2d 684 (affirmed *Dunham v. Vaughn & Bushnell Manufacturing Co.,* 42 Ill.2d 339, 247 N.E.2d 401):

"Rather than requiring an element of a physical flaw in the product, we believe that the duty contemplated by the court in *Suvada* is one of making the chattel safe for the use for which it is supplied."

In applying the foregoing principles to the question of whether a defect could be found to exist with respect to the gas supplied in the instant case, there are two important considerations. First, was the gas in its usual condition as contended by defendant? Second, did it perform as could have been reasonably expected for the purpose for which it was supplied?

■■ We accept the premise of the defendant there was nothing unusual or different in the chemical composition of the gas. Yet the physical characteristics of a product are just as much a part of its character or condition as its chemical composition. In other words, gas at a pressure of 75 p.s.i. is different from gas at 45 p.s.i. and consequently, gas supplied at the higher pressure may not be regarded as a matter of law as the same or equivalent of the usual product, meaning gas supplied at a lower pressure. For example, an acid may still be considered an acid even though its strength, a significant characteristic, may depend upon

dilution. As an initial premise, we believe that depending on the relevance of the characteristic, gas at a higher pressure is not the same product as that supplied at a lower pressure, and hence may not be regarded as the usual or customary product supplied.

■■ Proceeding next to consider the suitability of the gas for the purpose it was supplied, we conclude there is evidence from which it may be inferred the gas did not perform as the customer could have reasonably expected or anticipated. This is not a case where a gas company merely supplies its customary product for a general unspecified household or business use, rather this is a case where the customer needed gas for a particular purpose, namely gas of suitable quantity and quality to perform satisfactorily and efficiently in its lines and equipment. The gas product at 75 p.s.i. was offered by the gas company and accepted by the customer after the former, with full knowledge of the special purpose, determined the gas product was fit for such special purpose. This is in accord with section 2—315 of the Uniform Commercial Code (Ill. Rev. Stat. 1971, ch. 26, par. 2—315) entitled Implied Warranty: Fitness for Particular Purpose which states:

> "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

From the evidence it may be inferred defendant had knowledge of the specific purpose for which the gas was to be used, had actually inspected the equipment and lines of plaintiff to ascertain their nature and condition, and had determined based on such inspection the gas at the higher pressure was suitable for use in the plaintiff's lines and equipment. It also may be inferred from the testimony of several witnesses that the plaintiff relied on the defendant's determination or recommendation. (Kirk v. Stineway Drug Store Co., 38 Ill.App.2d 415, 187 N.E.2d 307.) Not only does the record show that Bergeson, the defendant's pressure supervisor, made the decision to by-pass the regulator, but it also appears the decision was made after inspection of the facilities, after consultation with plaintiff's plant manager, and after the plant manager had been assured the gas could be supplied at the higher pressure without damage to plaintiff's facilities and equipment. In such context we believe that there is sufficient evidence to authorize submission of this issue to the jury.

■■ This brings us to the problem of causation and the defendant's claim the evidence is insufficient to warrant any inference that any condi-

tion of its product caused plaintiff's injury. There is no duty upon the plaintiff making a prima facie products liability case to eliminate all possible causes of the incident other than the one which he has alleged. (See *Taylor v. Carborundum Co.*, 107 Ill.App.2d 12, 246 N.E.2d 898.) The fact there is evidence of other causes of an injury is like any other controverted issue of fact, a matter to be resolved by the jury, and it is the jury which decides which of the causes appears more reasonable. *Oliver v. Peoples Gas Light & Coke Co.*, 5 Ill.App.3d 1093, 284 N.E.2d 432.

■■ We believe plaintiff presented sufficient evidence of a defect and causation, although controverted, to allow these questions to go to the jury. It was shown the pressure was approximately 58 p.s.i. at the time the incident occurred, and there had been extreme fluctuations in pressure just prior thereto. From the testimony of one of the experts it appears that whenever a dryer shut off, the pressure in the transmission line caused the hose to expand or stretch slightly, which stretching was relieved or reduced when the dryer turned back on. Where the gas was supplied at the higher pressure, the elasticity of the hose did not always permit it to return to its former state and after this had occurred many, many times the hose could finally separate from its coupling fixture resulting in a line rupture and explosion. Based on this testimony the defendant insists the cause of the explosion was thus the shutting off and on of the dryer. While such is true, it is only half true, since it was the gas of the defendant, supplied at the higher pressure, which caused the dryer to go on and off more frequently. Also, the higher pressure, of the gas increased or accentuated the forces affecting the elasticity of the hose. Where there is such evidence of causation, a case such as *Shramek v. General Motors Corp.*, 69 Ill.App.2d 72, 216 N.E.2d 244, is inapplicable. The foregoing case involves a tire blowout and complete absence of any evidence regarding the cause of the blowout. Also, in an action for breach of implied warranty, a plaintiff need not show he was in the exercise of due care. (*Williams v. Brown Manufacturing Co.*, 45 Ill.2d 418, 261 N.E.2d 305.) As the court in *Williams* observed, the plaintiff is not obliged to prove his freedom from contributory negligence, and to the extent plaintiff's conduct may have been the cause of the injury, assumption of risk or misuse of the product is held to be an affirmative defense to be alleged and proved by defendant.

Assumption of risk is a defense urged by the defendant, but we regard the evidence as being in dispute. Plaintiff contends defendant has failed to prove that plaintiff assumed the danger with full knowledge thereof, since plaintiff lacked experience, knowledge and understanding of gas. Defendant, on the other hand, contends several of the plaintiff's em-

ployees had superior knowledge of the dryers and their operation, and also, Bartman, plaintiff's employee on duty the night of the fire, was aware of the danger and could have avoided the fire. The jury is to determine whether a user of a defective product has assumed the risk of using the product after assessing all the facts established by the evidence. (*Williams v. Brown Manufacturing Co.*, 45 Ill.2d 418, 261 N.E.2d 305.) We believe the evidence on the question of assumption of risk is sufficient for submission to the jury.

Plaintiff contends the trial court erred in refusing to give certain instructions requested by the plaintiff. Plaintiff's instruction No. 15 provided:

> "Gas is a dangerous commodity and a party which undertakes to furnish such service must exercise a degree of care commensurate to the danger which it is its duty to avoid and must use every reasonable precaution to guard against danger to the person or property of others."

The language of this instruction was taken from a prior court decision. In plaintiff's brief, it is argued that the proper way to instruct the jury is to charge defendant with the responsibility of exercising ordinary care, to define ordinary care as the care reasonable men would exercise under the circumstances and to additionally inform the jury that one of the circumstances to be considered is that of supplying a dangerous commodity which requires a greater amount of care.

Plaintiff's instruction No. 8 defined ordinary care and No. 9 charged defendant with responsibility of exercising ordinary care. It is claimed that the refused instruction would have instructed the jury that gas is a dangerous commodity and defendant must exercise care commensurate with that danger.

It is defendant's contention the trial court properly refused the instruction since it was not an IPI instruction, it uses language of a prior court decision, the jury was aware of the substance of the instruction and because it unduly emphasized the word "danger".

■■ The trial judge stated in his refusal of the instruction that the instruction was unnecessary. We believe the trial judge properly exercised his discretion. The jury was properly informed of the standard of care required of the defendant. The refused instruction could have confused the jury, since it was first instructed as to ordinary care whereas this instruction seeks to describe another degree of care. Since the jury was aware of the circumstances, the instruction defining ordinary care as "the care a reasonably careful person would use under circumstances similar to those shown by the evidence" was sufficient.

Next, the plaintiff argues the court committed reversible error when

it refused to give plaintiff's instruction No. 14, the issues instruction. As originally tendered the instruction included the charge that defendant "improperly inspected the dryers, hoses and hose clamps of the plaintiff." The court refused to give the instruction as tendered and the instruction was thereafter modified, resubmitted as plaintiff's instruction No. 16, and given without this specific charge of negligence. Plaintiff, on this appeal, argues the instruction should have included this specific charge of misconduct and the court's ruling to the contrary was erroneous and prejudicial. According to the plaintiff, the excluded portion of the issues instruction adequately sets forth a proper basis for defendant's liability under the circumstances of the case, is supported by sufficient evidence and is necessary to fully present plaintiff's theory of the case.

Appellee, on the other hand, urges; one, the issue was not included in the pleading; two, the defendant was under no duty to inspect the facilities of plaintiff and three, the theory was irrelevant because of other theories of misconduct advanced by the plaintiff. At the conference on instructions the record reveals when plaintiff's instruction No. 14 was tendered, defendant voiced the following objection to the instruction:

> "Subparagraph D, * * * implies that there was a duty on the part of the defendant to conduct an inspection and maintain the needs of plaintiff's equipment. There is nothing in the evidence, nor is there anything in the law that I know of which imposes that sort of duty on the defendant."

No other reason, authority or argument was advanced in opposition to the instruction, and so far as the record is concerned, the court accepted such objection as a controlling rule applicable to the facts. In accord with the general principle that objections to instructions are waived unless specified at the time the instructions are tendered, it follows that the propriety of the trial court's ruling presents a very narrow issue for review.

The defendant in its brief claims improper inspection was not alleged in the complaint. This is not correct. On March 24, 1972, plaintiff amended its complaint adding the allegation that defendant "carelessly, negligently and improperly inspected the heaters, hoses, appliances and service lines of plaintiff". Defendant denied the additional allegation in its answer to the amendments, filed March 27, 1972. The amendment and answer were filed prior to the commencement of the hearing before the jury. Since defendant's claim is without support in the record, it is without merit and offers no support for the court's ruling.

The general rule is that although a distributor of gas is not ordinarily charged with the duty of inspecting or maintaining privately owned pipes or appliances in the building or on the property of its customers, if it

undertakes to inspect pipes and installations on the property of the customer, it will be liable for its negligence in so doing. (26 Am. Jur.2d *Electricity, Gas & Steam* §§ 223, 224, 225, 230, 231, 232 and 246 and 38 C.J.S. *Gas* § 42(d).) In *Clare v. Bond County Gas Co.*, 356 Ill. 241, 190 N.E. 278, the principal case relied upon by defendant, the court applied the foregoing rule and found there was no duty on the part of the gas company to inspect the pipes under the customer's floor which pipes were where an explosion took place. The *Clare* case has certain unique characteristics arising from the facts. It is because of their substantial dissimilarity from the facts of this case that an opposite result is indicated. In the *Clare* case, the court held as a matter of law, the company had no knowledge of any gas leaks from the pipe which ruptured to cause the explosion, had no duty to inspect the pipes merely because they were twenty five years old and finally the court found the company had not inspected the pipes and hence could not have been said to have done so negligently. The most significant difference between the *Clare* case and the case at bar is of course in *Clare*, the company did not inspect the pipes where the explosion took place while the converse is true in the case at bar. It should be pointed out at this juncture that the portion of the issues instruction excluded did not charge the company had failed, refused or neglected to inspect the lines in which the explosion took place, but only that the company having undertaken the duty of inspecting the lines did so negligently. Parenthetically, a particular act of improper inspection is a failure to discover or to warn plaintiff that the clamps were not proper for hose lines delivering gas at a higher pressure.

■■ A change in facts from those described in *Clare* might, we believe, result in a duty to inspect even where generally a gas company may not otherwise be required to do so. For example, the court in *Edwards v. North Shore Gas Co.*, 289 Ill.App. 32, 6 N.E.2d 489, concluded the duty of inspection existed even in the absence of actual knowledge of a leak or actual inspection. (See also Annotation, 26 A.L.R.2d 169.) In *Nelson v. Union Wire Rope Corp.*, 31 Ill.2d 69, 199 N.E.2d 769, the court (applying Florida law which we believe would be the same as Illinois law) distinguished the case of where a failure to inspect is excused when there is no duty to do so, from that case where the duty of inspection is undertaken even though there may have been no obligation to do so. In the latter case the defendant is required to exercise due care in its inspection and may be liable if it fails to do so. Such a rule as applied to the facts of the instant case seems particularly appropriate. The gas company at the request of its customer, having undertaken the inspection of the

customer's lines and equipment for the purpose of determining the practicability of improving the supply of gas by increasing its pressure, ought not to be able to avoid the effects and consequences of an improper inspection by now claiming it had no duty to conduct any inspection, so whether it did so negligently is of no concern to the customer. We are aware of no rule of law or of any case which requires us to ignore that the defendant actually undertook an inspection and indeed to do so would be contrary to established principles of law.

In seeking to minimize the effect and consequences of its conduct, the defendant suggests that perhaps it did not really inspect the customer's lines but only looked at them casually. The evidence in this regard amply supports contrary inferences. Not only is there evidence that knowledgeable employees of the gas company were aware of the problem of needing to supply additional gas, but it is also clear they examined the facilities for the purpose of determining whether the pressure could be increased without damage and from such examination made recommendations concerning the increase of gas pressure which were relied upon and accepted by the customer. In terms of commercial benefit to the defendant, the language of *Edwards* would be apropos.

■■ Nor do we believe the issue to be irrelevant. As the evidence developed, one theory of causation was that a hose clamp was not the right kind to be used on hoses conveying gas at the higher pressure. If so, then it may be inferred the gas company, in the exercise of due care in inspecting the lines and facilities, should have discovered any improper hose clamps and warned plaintiff of the potential consequences. We believe the issue is supported by ample evidence, presented a factual issue appropriately resolved by the jury and embodied a theory of liability not otherwise included in the issues instruction. *Oliver v. Peoples Gas Light & Coke Co.*, 5 Ill.App.3d 1093, 284 N.E.2d 432.

There have been other errors assigned by the plaintiff which we feel unnecessary to rule upon, since they are unlikely to reoccur during a new trial.

For the foregoing reasons, the judgment of the Circuit Court of Bureau County relating to Count I of the complaint based on negligence and Count III of the complaint based on breach of implied warranty is reversed and remanded with directions that plaintiff be granted a new trial on each of said counts.

Judgment reversed and remanded with directions.

SCOTT, J., concurs.

Mr. PRESIDING JUSTICE ALLOY dissenting:

Plaintiff's contentions have resulted in an unwarranted application of the products liability doctrine which is a clear departure from anything envisioned by the Illinois Supreme Court. An examination of the record clearly establishes that such position is unsound and that the judgment of the Circuit Court of Bureau County should be affirmed.

. From an examination of the record it is apparent that the trial court went as far as the court could properly go in permitting the case to go to the jury on the theory of negligence on part of defendant, and it is clear that no error which would justify a reversal occurred during the trial of the case. The complaint of plaintiff charged that defendant, a distributor of natural gas, by-passed its regulator and thus injected "uncontrolled gas", of a fluctuating and excessive pressure, into plaintiff's appliances, as a consequence of which a gas connection was broken, gas escaped, and an explosion and fire ensued. The record showed that at all times, a regulator controlled the pressure of gas to the 45 lb. pressure or, with the by-pass arrangement agreed to by the parties, at a 75 lb. limit. Nothing in the record tended to establish that "uncontrolled gas" was distributed to plaintiff. In Count I, plaintiff charged defendant with several negligent acts or omissions. Count III, which we will discuss later, charged defendant with breach of its implied warranties of merchantability and fitness for a particular purpose. It charged that defendant warranted to plaintiff that defendant's equipment would be fit for the purpose for which the equipment was utilized and that as a result of the breach of defendant's warranty, "unregulated gas" was permitted to enter plaintiff's premises. The cause was submitted to the jury on the negligence issue and all of the evidence which would relate to the 45 lb. pressure regulator, the by-pass with the 75 lb. pressure regulator, and variations and changes in the supply of gas, and charges of negligence on part of defendant including the pulsation, vibration and variation in gas pressure. All were considered by the jury in determining whether there was any basis for a finding that defendant was negligent so as to authorize a recovery.

It is clear that the gas which was supplied was not shown to be defective in any manner and that a fluctuation in the supply of gas to Pioneer as an industrial customer was a normal procedure and depended on the amount of customer usage of gas on the supply line. This was known to plaintiff. Only maximum pressure is controlled by regulators, and the regulator which had been in use covered a 45 lb. pressure as a maximum. Pioneer Hi-Bred representatives were advised that if a by-pass of the 45 lb. regulator was installed so as to eliminate the limitations of the 45 lb. regulator, the pressure which would go into the plaintiff's

facilities might go as high as 75 p.s.i. There was nothing which defendant did other than to supply gas in the ordinary fashion on the basis of the pressure which was known, communicated to, and agreed to by plaintiff. Plaintiff was clearly aware of the increase in pressure resulting from the by-pass of the 45 lb. regulator. The by-pass was installed as a result of plaintiff's request for additional gas, even at higher pressure, to conduct its corn-drying operations during high use periods. Plaintiff continued to operate its equipment knowing that the pressure would be variable, depending upon usage, and could rise as high as 75 p.s.i. When the by-pass had been removed on October 2, 1967, and the 45 p.s.i. regulator then again controlled maximum pressure, plaintiff had full knowledge that the equipment of plaintiff was subjected to pulsations and vibrations and that such conditions would result if the 45 p.s.i. regulator was by-passed and the 75 p.s.i. regulator controlled maximum pressure. Nevertheless, on October 12, 1967, with full knowledge of the consequences so far as plaintiff's equipment was concerned, plaintiff requested that the by-pass be again installed just before the breakdown of plaintiff's equipment for reasons as hereinafter stated. The pressure on the line had only reached 58 p.s.i. which was no greater than the pressure during prior usage by plaintiff. As a result of the trial, a jury found defendant not guilty on the basis of the entire record which tested the question as to whether or not defendant was negligent in any respect in supplying gas to plaintiff and in the use of the by-pass arrangement. The case was tried fairly and without reversible error and the verdict of the jury should stand.

In view of the fact that the majority opinion concludes that the trial court did not err in refusing plaintiff's instruction No. 15, I will not prolong this dissent by commenting at length on such instruction. In addition to the observations contained in the majority opinion as reasons for denying error in the refusal of the instruction, I believe that such instruction, given along with plaintiff's instruction No. 8 defining ordinary care, would have constituted unnecessary repetition and could have resulted in leading the jury to a conclusion that defendant was to be held to a standard of care higher than that required by law.

As to the issue with respect to Count III of plaintiff's complaint, I believe it is clear that the trial court acted properly in ordering its dismissal at the close of evidence. Such Count on its face seeks to establish liability as a result of defendant's alleged breach of implied warranties of merchantability and fitness for a particular purpose. (See Ill. Rev. Stat. 1969, ch. 26, §§ 2—314, 2—315.) On this theory, in support of such contention, plaintiff was required to plead and prove that it had given notice to defendant of the alleged breach of warranties (Ill. Rev. Stat.

1969, ch. 26, § 2—607(3)(a) ). Further, concerning the warranty of fitness for a particular purpose, plaintiff was required to allege and prove that it had relied upon the skill and judgment of defendant in connection with such warranty. (*Van Winkle v. Firestone Tire & Rubber Co.*, 117 Ill. App.2d 324, 253 N.E.2d 588, 589 (1969); *Kirk v. Stineway Drugs Store Co.*, 38 Ill.App.2d 415, 187 N.E.2d 307 (1963).) Notwithstanding these prerequisites to recovery. Count III of the complaint fails even, as a basic matter, to allege plaintiff's notice of breach to defendant, and on the basis of the record plaintiff failed to establish, even prima facie, that plaintiff relied upon the skill and judgment of defendant in determining whether plaintiff's facilities could withstand the increased pressures caused by the regulator by-pass.

From the record it is apparent that the evidence establishes, that, after defendant's representatives advised plaintiff of the nature and mechanics of the contemplated by-pass, it was *plaintiff's* decision to employ such method in achieving the required increased pressure. The assertion in the majority opinion that defendant's representatives concluded that plaintiff's equipment could withstand the higher pressure and advised plaintiff that such was the case, is simply not supported by the record, as shown by the testimony by witness O'Reilly that plaintiff was specifically asked if its equipment could withstand such pressure as it was in a better position to answer that question, which stands uncontradicted and unrefuted. The most that could be said as to defendant's determination that plaintiff's facilities could withstand the contemplated maximum pressure is that it "appeared" to Richard Bergeson that such was the case. The evidence that plaintiff asked defendant if damage could result from such pressure, and that defendant indicated damage could result only to the gas pressure gauges on the dryers, must be read in light of the fact that plaintiff had already determined that its facilities in general could withstand the highest pressure (75 p.s.i.) the system could possibly reach. The gauges, however, would register pressures only up to 60 p.s.i., and thus defendant advised plaintiff that there could be some damage to the gauges if the pressure at times should reach more than that figure.

Plaintiff apparently realizes its problems of proof as to the breach of warranties theory, for in this court it seeks to support Count III of the complaint by employing strict tort or product liability considerations, under which doctrine the elements of notice of breach and reliance need not be pleaded and proven by plaintiff. (*Suvada v. White Motor Co.* (1965), 32 Ill.2d 612, 210 N.E.2d 182; *Cunningham v. McNeal Memorial Hospital* (1970), 47 Ill.2d 443, 266 N.E.2d 897.) Simply as a suggestion, and not indispensable to determination of this cause, it is believed that,

even though the record would not support a recovery on the strict tort or product liability consideration, if plaintiff had wanted to proceed under any such theory, it should have drawn Count III of its complaint in accordance therewith. The strict tort or products liability doctrine was announced as the law of Illinois in 1965 by the Illinois Supreme Court's decision in *Suvada*. The instant complaint was not filed until 1970, some five years later. I do not believe it would be unduly burdensome upon a party for the courts to require that, in order for such party to recover damages under a particular doctrine in existence five years prior to the filing of a complaint, that party must properly frame its complaint under that theory. In making this observation, I am mindful that the complaint in *Suvada* was couched in terms of implied warranty as is also true in the cases of *Haley v. Merit Chevrolet, Inc.* (1966), 67 Ill.App.2d 19, 214 N.E.2d 347 and *Sweeney v. Matthews* (1968), 94 Ill.App.2d 6, 236 N.E. 2d 439, *aff'd* 46 Ill.2d 64, 264 N.E.2d 170 (1970), in which cases recovery (or, in *Haley*, the possibility thereof) was nonetheless ultimately premises upon strict tort liability. It must, however, be remembered that the *Suvada* case announced the existence of the strict liability doctrine for the first time in Illinois, and in both *Sweeney* and *Haley* the complaints had been filed in the trial courts before the Supreme Court's rendition of its *Suvada* opinion. Moreover, in *Sweeney*, the jury was duly instructed on strict tort liability and, most notably, on motion of plaintiff the complaint was ultimately supplemented in the trial court so as to specifically plead that theory. In *Haley*, no trial had yet occurred, the case was before the appellate court on appeal from the circuit court's dismissal of plaintiff's complaint. Under such circumstances, among others, those courts felt that plaintiff's failure to plead a theory not known to be in existence in Illinois at the time of the filing of their complaints should not, of itself, defeat their causes.

In the instant case, however, plaintiff is complaining about the trial court's dismissal of an improperly drawn complaint as to which insufficient evidence under the theory alleged thereby was produced in the trial court, and further, it is seeking to overturn the trial court's dismissal of that complaint on a theory never pleaded by plaintiff in the court, and which theory was clearly in existence in this State more than five years prior to the filing of the complaint in question. Under such circumstances, it appears that plaintiff's contentions as to the dismissal of Count III of its complaint are wholly without merit. Also, in view of the foregoing (even though the evidence would not support recovery on any such theory) it is believed that it should be unnecessary for this court to determine whether the strict tort or products liability doctrine is applicable here. Even if plaintiff is not required to plead specifically in this

respect, the record clearly shows that plaintiff was not entitled to recover.

The conclusion in the majority opinion that the trial court erred in refusing plaintiff's instruction No. 14, I believe, is not justified. In absence of its having received notice of defects, there has never been an obligation imposed on a gas supplier in Illinois to exercise reasonable care in ascertaining whether or not its customers' facilities are fit to accept gas transmitted thereto (*Clare v. Bond County Gas Co.*, 356 Ill. 241, 244). Plaintiff here seeks to engraft another exception upon this rule (*i.e.*, that if a supplier voluntarily undertakes to observe part of a customer's facilities, it is liable for damage proximately caused by a negligent failure of inspection of all of such facilities). Its instruction No. 14 is improper even if that were the law in this State. Plaintiff's instruction No. 14 *assumes* that defendant purported to inspect plaintiff's facilities, and the record in this case establishes that at the very most there existed a question of fact as to whether that was true. A proper instruction in this matter, if indeed a proper one could be framed in accordance with Illinois law, would necessarily require the jury to determine whether defendant had voluntarily undertaken an inspection of plaintiff's facilities, and only if that question is resolved in the affirmative could the jury be asked to determine whether defendant was negligent in making its inspection, and, necessarily, whether such negligence was the proximate cause of plaintiff's damage and loss. Plaintiff's instruction No. 14 is thus at best incomplete, assuming as it does a duty of defendant not established in the record as a matter of law. The trial court properly refused to give it to the jury.

On the issue as to what in fact caused the fire and resultant loss, it is obvious that it was not the gas pressure alone. As a matter of fact, it appears from the testimony of plaintiff's own expert that the damage resulted from rapid opening and closing of the shut-off valves in plaintiff's dryer, resulting in the vibration and flexion of a gas hose thereto which hose then burst near a coupling between the two extensions of hose held together by an automobile hose clamp connection. Under those circumstances, it was clearly incumbent upon plaintiff to show, as a condition precedent to recovery on the questions of negligence and *proximate cause* (which latter element of proof is a prerequisite to recovery under any of the theories attempted to be used by plaintiff), that plaintiff's own hoses and connections were in proper repair and order. (*Feder v. Ill. Power Co.*, 3 Ill.App.2d 319, 122 N.E.2d 53 (1954).) Nevertheless, careful reading of the record discloses little, if any, evidence tending to show that plaintiff's equipment was in a good state of repair. Thus, there was no evidence that the hoses and connections were in good repair, and indeed the testimony that the hose in question was 5 or 6 years old, that

the dryers were 30-35 years old, and that the system was operating on a 24-hour basis might conceivably allow an inference that plaintiff's equipment was not in good repair.

Plaintiff apparently argues, in this connection, that since testimony of its expert establishes that the use of the automobile hose clamp by plaintiff to connect the two extensions of hose was bad practice, such use constituted a "defect" *in plaintiff's system,* vaguely contended by plaintiff to be known to defendant, and thus defendant could be held liable for this loss under the recognized "notice of defect" exception to the rule stated in *Clare v. Bond County Gas Co.,* that suppliers are not ordinarily responsible for the fitness of their customer's facilities. This argument is unavailing, however, in that, again, there is no adequate showing in the record that plaintiff's hoses and the clamp connecting the same were structurally or materially in proper repair, and that, nonetheless, the hose burst near the clamp due to the inherent weakness of the configuration itself. Accordingly, it may well be that the trial court allowed plaintiff more than it was entitled to by giving the case to the jury, even on the negligence count. In any event, however, it is very clear that the trial court did not commit error in refusing to direct a verdict for plaintiff or to award it a new trial.

Another contention of error raised by plaintiff is not reached by the majority opinion on the premise that it is not likely to recur during a new trial. Since I believe that no new trial is warranted, however, it is necessary to comment on the matter, which relates to the redirect examination of plaintiff's expert witness, one Edward McLean. On direct examination, Mr. McLean testified that various standards relating to pressure piping promulgated by the American Association of Mechanical Engineers were applicable to the situation at Pioneer. On cross-examination, however, he stated that these standards applied to defendant's facilities but, with one exception, not to plaintiff's facilities, line, and equipment, and that the standards did not purport to require defendant to inspect plaintiff's facilities. On redirect examination, plaintiff apparently sought to elicit testimony from Mr. McLean that although the standards were not directly applicable to plaintiff's facilities, they nonetheless imposed "certain duties" on defendant in connection with the operation of its facilities. The court sustained defendant's objection to this line of redirect examination, which, we are now told, would have put to rest the apparent conflict between McLean's direct testimony and that on cross-examination relating to the application of the standards. While on this record I believe this "conflict" is more apparent than real, I note that plaintiff made no definitive offer of proof concerning the testimony sought to be adduced on redirect. Such being the case, this court is unable to adequately assess

plaintiff's assertion of error, and plaintiff's point is thus not properly preserved for review. *McMahon v. Coronet Insurance Co.* (1972), 6 Ill. App.3d 704, 286 N.E.2d 631.

The record shows that plaintiff was on the same gas supply line as was another large industrial gas user and knew that the pressure would necessarily increase in its line during periods of lower usage by the other commercial customer and fluctuate depending on usage. The 45 p.s.i. regulator was designed to hold down the maximum to that particular amount. When plaintiff first agreed to have the by-pass of the 45 p.s.i. regulator and the installation of a 75 p.s.i. regulator, it had such installation in operation from September 27, 1967 to October 2, 1967. During this period of time, it was noted that there were necessarily fluctuations in the gas pressure and pulsation and vibration of plaintiff's equipment and conditions of the type noted immediately prior to the fire which is the basis of the claim as against defendant. Plaintiff then had the by-pass removed by defendant on October 2, 1967. Thereafter, plaintiff requested, on October 12, 1967 (the day of the fire), that the by-pass be installed again, with full knowledge that the pressure would fluctuate and might rise as high as 75 p.s.i. and that the same conditions as to vibration of plaintiff's equipment would result. Additionally, on the date of the fire, a responsible representative of plaintiff was aware of the conditions and the fact that plaintiff's supply hose was vibrating for at least an hour before the fire, but the gas usage was not turned off by plaintiff's agent.

We thus have a case where nothing was shown to be wrong with the gas and where a jury, after a full-dress trial, determined that defendant was not negligent in supplying gas to plaintiff and in installing the by-pass and regulators in this case. Plaintiff now asks that we not only reject the determination of the jury and the trial court but that we create an extension or expansion of the products liability doctrine to make the gas supplier an insurer of defects or deficiencies in plaintiff's own distribution system, and even ignore the normal products liability requirement of proximate causation. Such conclusion would establish a precedent not sanctioned or justified by the decisions of the Supreme Court of this State or by any sound interpretation of precedents.

It is clear from an analysis of the record that plaintiff has had its day in court as a result of a trial free from reversible error. The trial court ruled correctly, or at least did not err in favor of defendant, on matters now properly presented for review, and its judgment based on the jury verdict should accordingly be affirmed by this court.